2008 WY 61

**Sonder W. SEYMOUR, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

**No. S–07–0255.**

Supreme Court of Wyoming.

June 5, 2008.

Representing Appellant: Dion J. Custis of Dion J. Custis, P.C., Cheyenne, Wyoming.

Representing Appellee: Bruce A. Salzburg, Wyoming Attorney General; Terry L. Armitage, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; Graham M. Smith, Assistant Attorney General.

Before VOIGT, C.J., and GOLDEN, HILL, KITE, and BURKE, JJ.

KITE, Justice.

[¶ 1]   Sonder W. Seymour pled guilty to felony possession of marijuana with intent to deliver.  He reserved the right to appeal the denial of his motion to suppress evidence seized from his vehicle after a traffic stop. Mr. Seymour claims the district court erred in denying the motion because he did not voluntarily consent to the trooper's second round of questions and the trooper did not have a reasonable suspicion of criminal activity justifying Mr. Seymour's detention until a drug dog arrived.  We affirm.

## ISSUE

[¶ 2] The sole issue for our determination is whether the search of Mr. Seymour's vehicle violated his rights guaranteed by article 1, § 4 of the Wyoming Constitution or the Fourth Amendment to the United States Constitution.

## FACTS

[¶ 3] On November 15, 2006, at approximately 3:00 p.m., Wyoming Highway Patrol Trooper Jeremy Beck was patrolling westbound on I–80 east of Cheyenne in Laramie County, Wyoming.[1] He observed a vehicle traveling east that appeared to be speeding. He visually estimated the vehicle's speed at around 80 miles per hour and confirmed that with his radar. He turned around and pursued the speeding vehicle.

[¶ 4] Trooper Beck pulled up behind the vehicle with his lights flashing as the vehicle was passing a pickup truck. The driver looked in his rearview mirror, saw the patrol car behind him and turned abruptly into the driving lane in front of the pickup truck. Trooper Beck waited until the pickup truck could back off to allow him to move in between them. The vehicle pulled over to the side of the highway and Trooper Beck followed.

[¶ 5] Trooper Beck approached the passenger side window and told the driver, who turned out to be Mr. Seymour, that he had stopped him for speeding. Trooper Beck asked Mr. Seymour for his driver's license and insurance information. Mr. Seymour responded that the car was a rental. Trooper Beck asked to see the rental agreement. As Mr. Seymour handed him the documents, Trooper Beck asked him if he would mind coming back to the patrol car. He asked Mr. Seymour to sit in the front passenger seat.

[¶ 6] In the patrol car, Trooper Beck asked Mr. Seymour where he was headed. Mr. Seymour said he was going to Philadel-

phia and then on to Vermont. Trooper Beck informed Mr. Seymour that he was going to issue him a warning for speeding.

[¶ 7] Trooper Beck asked Mr. Seymour if he had rented the vehicle. Mr. Seymour said that his mother's friend, Jill, whose last name should be on the agreement, rented it for him because he "was a little younger . . . ." and she was helping him out. Trooper Beck realized the rental agreement was not among the documents Mr. Seymour had given him and asked him if he would mind getting it from the vehicle. Mr. Seymour retrieved the document and Trooper Beck asked him again the last name of the person who had rented the vehicle. Mr. Seymour again indicated her name should be on the agreement. Trooper Beck asked Mr. Seymour how long he planned to be in Vermont. Mr. Seymour said "until the end of the holidays, I think. [I'm going to] see my [inaudible] family. I haven't been back there since I was about sixteen years old."

[¶ 8] Trooper Beck asked when he rented the car. Mr. Seymour said he rented it on Monday. Trooper Beck asked how long he would have the vehicle. Mr. Seymour said he could have it until the 21st, but he would be dropping it off before then in Philadelphia because he and a friend were driving to Vermont. He said he would be in Philadelphia before the 21st but had rented the car until then as a precaution in case the drive took longer.

[¶ 9] At that point, just before 3:16 p.m., Trooper Beck informed Mr. Seymour, "I wrote you a warning for speed, okay? Here's your information back and you're free to go, okay? Drive careful, all right?" Mr. Seymour asked if he should wait for Trooper Beck to pull out before he pulled out onto the highway. Trooper Beck responded, "You're free to go."

[¶ 10] As Mr. Seymour walked back toward his vehicle, Trooper Beck got out of the

---

1. These facts are taken from Trooper Beck's testimony at the suppression hearing. The facts set forth in paragraphs 5 through 12 are taken from the video tape recording of the traffic stop, which the State introduced as an exhibit at the suppression hearing and defense counsel designated as part of the appellate record. Trooper Beck and Mr. Seymour are seen on the video only briefly when they are next to the rental vehicle or in front of the patrol car. They cannot be seen during the questioning inside the patrol car or off to the side of the roadway. However, most of the questions and answers are audible on the tape recording.

patrol car and said, "Sir? Before you head out do you mind if I speak to you for just a little bit longer? Okay? You don't have to it's just I have some questions just real quick, if you don't mind. You okay with that?" Mr. Seymour said, "Yeah." Trooper Beck asked him to step over to the side of the highway and the following exchange occurred:

Trooper Beck: You're headed back to, uh, Vermont, is that what you said?

Mr. Seymour: Yeah.

Trooper Beck: Okay. And you're coming from where?

Mr. Seymour: From Santa Rosa.

Trooper Beck: Santa Rosa, California? Okay. Do you live in Santa Rosa, California?

Mr. Seymour: I live in Windsor, which is just north of Santa Rosa.

Trooper Beck: Oh, really. Okay. And, uh, you're headed back to where?

Mr. Seymour: Vermont.

Trooper Beck: Vermont?

Mr. Seymour: Yeah.

Trooper Beck: Okay. You said another state, too. Where else was it that you're headed to?

Mr. Seymour: Philadelphia.

Trooper Beck: Philadelphia.

Mr. Seymour: A friend of mine that I know is coming back, he's going to meet me back there.

Trooper Beck: Okay.

Mr. Seymour: I don't know which ... where ... which part he is ... but I'll call him when I get back there.

Trooper Beck: Okay. All right. Uh. What are you headed back for, you headed back for ...

Mr. Seymour: Just to see some of my family and stuff like that. I could have flown back but I figured. . . .

Trooper Beck: Yeah, what was the ... why didn't you fly?

Mr. Seymour: Just to have some fun. I've never really driven across the states before so. . . .

Trooper Beck: Oh, really. How you liking that so far? Pretty good?

Mr. Seymour: Well, until now. It's all right. It's okay. It got a little windy and crazy back there but. . . .

Trooper Beck: Yeah.

Mr. Seymour: [inaudible]

Trooper Beck: Have you drove straight through so far?

Mr. Seymour: Just on 80.

Trooper Beck: Just on 80?

Mr. Seymour: Just like 20 to 80. 20 is about like. . . .

Trooper Beck: Where, where you staying?

Mr. Seymour: In Philadelphia?

Trooper Beck: No, I mean have you been staying in motels on the way out or ...

Mr. Seymour: Truckee.

Trooper Beck: Where?

Mr. Seymour: Truckee [inaudible]

Trooper Beck: No, I haven't heard of that. How far away from Santa ... ?

Mr. Seymour: Santa Rosa? It's like a good 5, 6 hour drive.

Trooper Beck: Okay. Then you spent the night?

Mr. Seymour: Spent the night and then I was in ... just after Utah, or Salt Lake City, the town right just past Utah, can't think of the name of it.

Trooper Beck: Okay. And then you headed on back from there? Are you planning on staying somewhere else, too?

Mr. Seymour: Tonight I was hoping to make it, well judging by the time, probably somewhere [inaudible] off the side of the road somewhere tonight.

Trooper Jim Hess: Nebraska has a lot of nice little towns in it [inaudible].[2]

Mr. Seymour: Yeah, that's what I was hoping [inaudible] ... probably about 6, 7 o'clock.

Trooper Beck: Yeah. What do you do for a living?

---

**2.** Trooper Beck testified at the suppression hearing that Trooper Hess arrived about halfway through the questioning that occurred outside the patrol car on the side of the highway.

Mr. Seymour: I'm a bartender.

Trooper Beck: Oh, are you? Out in California?

Mr. Seymour: Out in California.

Trooper Beck: Okay. How long did you take vacation?

Mr. Seymour: I took a little time off. I've been saving up for a long time, so ...

Trooper Beck: How long did you take?

Mr. Seymour: Probably until about the 21st when I have to go back, but I got a pretty good boss who's going to let me, uh....

Trooper Beck: That's when you're going back? The 21st?

Mr. Seymour: Yeah.

Trooper Beck: Of November?

Mr. Seymour: [inaudible]

Trooper Beck: Of November?

Mr. Seymour: Yeah, around that.

Trooper Beck: So you're going to fly back then?

Mr. Seymour: Yes, sir.

Trooper Beck: You'll fly? Okay. So you drove out and then you're going to fly back?

Mr. Seymour: Right. This is a one way that I got to drop off so ...

Trooper Beck: Okay.

Mr. Seymour: I'll be flying back.

Trooper Beck: Okay. There's nothing illegal in the vehicle is there?

Mr. Seymour: Oh, no, sir.

Trooper Beck: No marijuana?

Mr. Seymour: No, sir.

Trooper Beck: No methamphetamines?

Mr. Seymour: No, sir, none of that.

Trooper Beck: No cocaine?

Mr. Seymour: No, sir.

Trooper Beck: No explosives, or anything like that? Correct?

Mr. Seymour: None of that.

Trooper Beck: Okay.

Mr. Seymour: No [inaudible], no nothing. Just don't want to be too stupid about that, you know, even alcohol.

[¶ 11] At this point, Trooper Beck asked Mr. Seymour if he had any problem giving him consent to search the vehicle for illegal "stuff." Mr. Seymour said he would rather not. He said he had some alcohol in the vehicle. Trooper Beck informed him that alcohol was not illegal and asked again if he would consent to a search. Mr. Seymour reiterated that he would rather not. Trooper Beck informed Mr. Seymour that he was going to detain him while he arranged for a canine to be brought to perform a free air sniff of the vehicle.

[¶ 12] Approximately eight minutes later, Trooper Chatfield arrived with a dog. The dog alerted to the outside of the vehicle. The troopers searched the vehicle and found 65 pounds of marijuana in vacuum sealed bags.

[¶ 13] The State filed charges against Mr. Seymour for felony possession of marijuana. Prior to trial, Mr. Seymour filed a motion to suppress the evidence seized from the vehicle, claiming the search violated the Wyoming Constitution because it was not reasonable under all the circumstances and the United States Constitution because Trooper Beck did not have reasonable suspicion to detain Mr. Seymour.

[¶ 14] At a hearing on the motion, the State called Trooper Beck to testify. He testified that his suspicions were initially aroused when, upon seeing the patrol car behind him, Mr. Seymour turned so abruptly in front of the pickup truck he was passing. He testified that his suspicions were further aroused when he spoke to Mr. Seymour from outside the passenger window, and he "appeared very nervous. He was shaking. When he gave me the rental agreement, he was shaking. You could see the rental agreement shaking as he was handing it to me and his driver's license." Trooper Beck also testified that a cell phone in the vehicle was ringing and he thought it unusual that Mr. Seymour did not answer it or acknowledge it in any way.

[¶ 15] Trooper Beck testified that he grew increasingly suspicious of Mr. Seymour because:

After being told he was getting a warning, Mr. Seymour's nervousness did not subside. "He continued to shake. His knee

was going back and forth. He was [w]ringing his hands ... when he was talking to me. Just seemed uncontrollably like he couldn't quit being nervous. It was like he was trying to hide something more than I initially stopped him for."

Mr. Seymour's age was not a reason to have someone older rent the car; he was 26 years old and past the 25–year–old age limit for renting a car.

Mr. Seymour said he rented the car longer than he needed it in case he had trouble getting from California, but "no matter how much trouble you have, you shouldn't have that long a drive just back to Vermont."

He did not understand why Mr. Seymour would drop the car off in Philadelphia if he got there early when he had paid for several more days; the agreement stated he could be charged a higher rate if he returned the car before November 21.

Mr. Seymour referred him to the rental agreement for answers, as though he was not sure who rented the vehicle, what the person's name was or the rental dates. Mr. Seymour said he had to be back at work in California on November 21, which was before the holidays when he said he was going to be visiting family in Vermont. Mr. Seymour said he only drove five to six hours the first day, which seemed "strange" since he had a cross-country drive ahead of him.

After saying he would rather not consent to a vehicle search, Mr. Seymour said he had alcohol in his vehicle; Mr. Seymour was 26 years old and having alcohol in his vehicle was not illegal.

Based upon the totality of these circumstances, Trooper Beck testified that he concluded he had reasonable suspicion to detain Mr. Seymour while a dog was brought to sniff the vehicle.

[¶ 16] The district court entered an order denying the suppression motion, concluding from all of the circumstances Trooper Beck had reasonable suspicion to detain Mr. Seymour after issuing the warning ticket. Among the factors the district court relied on were: Mr. Seymour's "extreme nervousness"; the third party rental agreement; the one way rental agreement; Mr. Seymour did not know the name of the person who rented the vehicle; the inconsistency between Mr. Seymour's travel plans and the rental agreement; and Mr. Seymour's explanation of why the other person rented the vehicle. Mr. Seymour pled guilty to the charge of felony possession of marijuana conditioned upon his right to appeal the order denying his suppression motion. The district court entered judgment against Mr. Seymour, sentenced him to three to five years in prison, and suspended the sentence in favor of four years supervised probation.

## STANDARD OF REVIEW

[¶ 17] The question of whether an unreasonable search or seizure occurred in violation of constitutional rights presents a question of law which we review *de novo. Negrette v. State,* 2007 WY 88, ¶ 11, 158 P.3d 679, 682 (Wyo.2007). However, we review a district court's factual findings on a suppression motion under the clearly erroneous standard. *Hall v. State,* 2007 WY 138, ¶ 5, 166 P.3d 875, 877 (Wyo.2007). We view the evidence in the light most favorable to the district court's determination because it conducts the motion hearing and has the opportunity to assess the credibility of the witnesses, weigh the evidence and make the necessary inferences, deductions and conclusions.

## DISCUSSION

[¶ 18] Mr. Seymour claims the search of his vehicle violated the state and federal constitutions because his consent to further questioning was not voluntary and Trooper Beck did not have a reasonable suspicion of illegal activity to warrant detaining him without his voluntary consent. Mr. Seymour does not claim and there is no evidence that the traffic stop was unjustified or that the initial detention inside the patrol car exceeded the scope of the stop. Therefore, we begin our discussion with consideration of whether Mr. Seymour's consent to further questioning was voluntary.

[¶ 19] The right of citizens to be free from unreasonable searches and seizures is guaranteed by article 1, § 4 of the Wyoming Constitution and the Fourth Amendment to the United States Constitution. This Court has recognized that

> a waiver of constitutional rights under our constitution must appear by clear and positive testimony, and, if a search or seizure is based upon the proposition that consent was given, there should be no question from the evidence that consent was "really voluntary and with a desire to invite search [or further questioning], and not done merely to avoid resistance." Acquiescence and nonresistance have not been deemed sufficient under Wyoming law to establish consent.

*O'Boyle v. State*, 2005 WY 83, ¶ 38, 117 P.3d 401, 412 (Wyo.2005). Under both the United States and Wyoming Constitutions, we examine the totality of the circumstances to determine whether consent was voluntary. We consider factors such as the demeanor of the law enforcement officer, whether the individual was told he could refuse the request, the presence of other law enforcement officers, the length of the detention and nature of the questioning before consent was given and other coercive factors. *O'Boyle*, ¶¶ 40–42, 61, 117 P.3d at 413, 418.

[¶ 20] Considering the totality of the circumstances in Mr. Seymour's case, we conclude that his consent to further questioning was voluntary. The videotape recording of the stop reflects that Trooper Beck addressed Mr. Seymour courteously and respectfully. He was not threatening, antagonistic or coercive. He asked Mr. Seymour if he would mind if he spoke with him a bit longer, told him he did not have to agree and asked him twice if he was okay with answering more questions. Mr. Seymour responded, "Yeah." At that point in the stop, no other law enforcement officers were present, Mr. Seymour had been detained for less than 15 minutes, and the questioning in the patrol car had been brief and focused on the rental agreement and Mr. Seymour's travel plans. Additionally, prior to being asked if he would mind if Trooper Beck spoke with him a bit longer and being told that he did not have to agree, Mr. Seymour had been told twice that he was free to go.

[¶ 21] Mr. Seymour cites *O'Boyle* and *Campbell v. State*, 2004 WY 106, 97 P.3d 781 (Wyo.2004) as support for his contention that, under the Wyoming Constitution and the United States Constitution respectively, his consent was not voluntary. Neither case supports his contention. Both cases involved traffic stops during which the trooper exceeded the scope of the stop during the initial questioning. Because we held the initial detention unconstitutional, the State had the burden of proving that the motorists' subsequent consent was sufficiently voluntary to overcome the illegal detention. In both cases, the factors we considered in determining that the initial detention was unconstitutional were also considered in determining that the consent was involuntary. In *O'Boyle*, ¶ 41, 117 P.3d at 413, for example, we said:

> by the time Trooper Peech asked Mr. O'Boyle if he could ask him a few more questions, he had already questioned Mr. O'Boyle for seven minutes about his trip, his activities leading up to the trip, his son and daughter, his occupation and other tangential topics. He also had called for a canine unit, which arrived during the initial questioning and parked behind Trooper Peech's patrol car. Despite these circumstances, and his later admission that he did not have reasonable suspicion to detain Mr. O'Boyle further, Trooper Peech detained Mr. O'Boyle on the edge of the interstate highway for another five minutes....

Based in part upon the initial illegal detention, we concluded the consent that followed was not voluntary.

[¶ 22] In *Campbell*, ¶ 14, 97 P.3d at 785 (emphasis added, citations omitted) we said:

> "The government bears the burden of proving the voluntariness of consent, and *that burden is heavier when consent is given after an illegal stop.*" In determining whether a detained motorist freely and voluntarily consented to a further detention or search *after an illegal detention,* we must consider the totality of the circumstances surrounding the consent, with

a focus upon three factors ...: "the temporal proximity of the illegal detention and the consent, any intervening circumstances, and, particularly, the purpose and flagrancy of the officer's unlawful conduct." *In other words, the State had the burden of establishing that Campbell's consent was "sufficiently an act of free will to purge the primary taint of the illegal [detention], [or] it must be suppressed as fruit of the poisonous tree."* Applying these standards, we held in *Campbell* that the consent was not voluntary. We reached that conclusion based on the evidence that the motorist was not informed that he was free to leave or that he could refuse the trooper's request and because the evidence did not show that the motorist's consent was sufficiently an act of free will to purge *the primary taint of the illegal detention.*

[¶ 23] Unlike *O'Boyle* and *Campbell,* there is no contention or finding in Mr. Seymour's case that the initial detention inside the patrol car was unconstitutional. Therefore, an initial illegal detention is not among the factors we consider in determining whether his consent was voluntary. Unlike *O'Boyle* and *Campbell,* Mr. Seymour was advised that he was free to leave and that he was not required to consent to further questioning. Given these distinctions, *O'Boyle* and *Campbell* provide little support for Mr. Seymour's claim that he did not voluntarily consent to further questioning.

[¶ 24] Having concluded that Mr. Seymour's consent was voluntary, we need not consider whether Trooper Beck had reasonable suspicion of illegal activity to warrant further questioning. Voluntary consent obviates the necessity of determining whether the trooper had sufficient reasonable suspicion of criminal activity to pursue further questioning. *Marinaro v. State,* 2007 WY 123, ¶ 10, 163 P.3d 833, 836 (Wyo.2007). We turn to consideration of whether, after the second round of questioning, Trooper Beck had reasonable suspicion of illegal activity to detain Mr. Seymour for a canine sniff.

[¶ 25] By the time Trooper Beck informed Mr. Seymour he was going to detain him while a canine was brought to the scene, he knew that Mr. Seymour was driving a rental car that he had not rented and could not tell him the last name of the person who had rented it. He also knew that Mr. Seymour said he was going to Vermont to visit family for the holidays but also said he had to be back at work on November 21, which was before the holidays. Trooper Beck also knew that the rental agreement allowed seven days to drive from Santa Rosa, California to Philadelphia, Pennsylvania but that Mr. Seymour intended to turn the car in early even though it would cost him more. Additionally, Trooper Beck had observed behaviors by Mr. Seymour suggesting that he was very nervous, including pulling directly in front of another vehicle when he first saw the patrol car and shaking, wiggling and wringing his hands even after he knew he was only getting a warning. Considering the totality of the circumstances, as we are required to do, we hold that Trooper Beck had reasonable suspicion of unlawful activity to detain Mr. Seymour until the canine arrived.

[¶ 26] One of Mr. Seymour's arguments to the contrary is that nervousness is of limited significance in assessing whether reasonable suspicion existed for detention and, in his case, absent the nervousness, the totality of the circumstances did not give rise to a reasonable suspicion to detain him for a canine sniff. Mr. Seymour is correct that nervousness is of limited significance in determining whether reasonable suspicion exists. *Damato v. State,* 2003 WY 13, ¶ 20, 64 P.3d 700, 708 (Wyo.2003). However, it is not disregarded entirely. Abnormal or continuous nervousness may be considered along with other factors in determining whether a law enforcement officer had reasonable suspicion to detain a motorist. *Marquez–Guitierrez v. State,* 2007 WY 155, ¶ 28, 167 P.3d 1232, 1238 (Wyo.2007); *Negrette,* ¶ 20, 158 P.3d at 684. Trooper Beck's testimony that Mr. Seymour was "uncontrollably" nervous and that his nervousness did not subside were appropriate factors to consider in determining whether Trooper Beck had reasonable suspicion of unlawful activity justifying Mr. Seymour's detention. We hold that by the time Trooper Beck indicated he was calling for the canine, he had reasonable suspi-

cion that Mr. Seymour was involved in unlawful activity to support the detention.

## CONCLUSION

[¶ 27] It is undisputed that Mr. Seymour's initial detention was justified by his speeding violation and did not exceed the scope of the stop. After Trooper Beck returned Mr. Seymour's documentation and told him that he was free to go, Mr. Seymour voluntarily consented to further questioning. Mr. Seymour's voluntary consent vitiates the requirement of showing reasonable suspicion for the second detention. Finally, based upon the totality of the circumstances at the time he called for the canine unit, Trooper Beck had reasonable suspicion to detain Mr. Seymour for the purpose of a canine sniff. The detention did not violate Mr. Seymour's rights under article 1, § 4 of the Wyoming Constitution or the Fourth Amendment to the United States Constitution.

[¶ 28] Affirmed.