2009 WY 61

**Yoeun YOEUTH, Appellant (Defendant),**

**v.**

**The STATE of Wyoming,
Appellee (Plaintiff).**

**Derrick M. Loo, Appellant (Defendant),**

**v.**

**The State of Wyoming, Appellee
(Plaintiff).**

Nos. S–08–0136, S–08–0170.

Supreme Court of Wyoming.

May 1, 2009.

Representing Appellant, Yoeun Yoeuth: Diane M. Lozano, State Public Defender; Tina N. Kerin, Appellate Counsel; Eric M. Alden, Senior Assistant Appellate Counsel. Argument by Mr. Alden.

Representing Appellant, Derrick M. Loo: Dion J. Custis, Dion J. Custis, PC, Cheyenne, Wyoming.

Before VOIGT, C.J., and GOLDEN, HILL, KITE, and BURKE, JJ.

BURKE, Justice.

[¶ 1] In their consolidated appeals, Derrick Loo and Yoeun Yoeuth challenge the district court's denial of their motions to suppress evidence obtained during a traffic stop and subsequent search of the vehicle's trunk. We affirm in both cases, although in Ms. Yoeuth's, on a basis different from that of the district court.

## ISSUES

[¶ 2] Mr. Loo states his issue as follows: Did the trial court abuse its discretion and commit reversible error when it denied appellant's motion for suppression?

[¶ 3] Ms. Yoeuth presents this issue: Did Ms. Yoeuth have standing to object to the stop of the vehicle in which she was a passenger, and did she lose that standing by vague statements regarding the contents of the rental vehicle's trunk?

## FACTS

[¶ 4] At about two o'clock on the afternoon of November 3, 2007, Wyoming Highway Patrol Trooper Jason Green was on duty on Interstate 80 east of Rawlins. He observed a speeding eastbound vehicle, and gave chase. During the pursuit, as he was about to overtake a silver-colored passenger car, the driver of that car abruptly hit his brakes. As Trooper Green described it, the driver "[m]ashed on them pretty hard" and "slowed way down."

[¶ 5] Trooper Green thought that behavior unusual, so he contacted dispatch for a check on the silver car's license plate number. The dispatcher initially responded that there was no record of this license plate. However, Trooper Green had mistakenly read an "8" on the license plate as a "B." When that error was corrected, the dispatcher informed Trooper Green that the license plate now appeared to be registered to two different vehicles. Given that information,

Trooper Green abandoned his chase of the speeding vehicle and continued to observe the silver car. As Trooper Green followed, the driver again hit the brakes abruptly, and slowed from 75 miles per hour, the speed limit, to 65 miles per hour. When the car came up behind a semi truck, it did not pass, but instead followed behind at approximately one car length, and continued following closely for approximately half a mile. Trooper Green decided to stop the silver car for following the truck too closely.

[¶ 6] When Trooper Green stopped the car, he noticed for the first time that there was a passenger. Approaching the driver's window, he detected a strong smell of perfume coming from inside. He told the driver that he had been stopped for following another vehicle too closely, and because the license plate was registered to two different vehicles. The driver informed the trooper that the car was rented. The trooper asked for a driver's license, and learned that the driver was Derrick Loo. The trooper also asked for the rental agreement. When Mr. Loo reached into the glove compartment to get it, Trooper Green saw two different rental agreements in the glove box, one from Hertz and one from Avis. Trooper Green also noticed that Mr. Loo's hands were trembling, he appeared very uncomfortable, and an artery was pulsing visibly at his temple. During this time, the passenger fixed her stare straight forward, not looking at Trooper Green or engaging him in any way.

[¶ 7] The Hertz rental agreement indicated that Mr. Loo had rented the car in Reno, Nevada, just after midnight earlier the same day. It was a one-way rental agreement, with the car to be turned in at Indianapolis, Indiana. After examining the rental agreement, Trooper Green asked Mr. Loo to come to the patrol car. He told Mr. Loo that he would get a warning citation for following too closely.

[¶ 8] Although it was cold outside, Mr. Loo was sweating heavily as he entered the passenger side of the patrol car. When Mr. Loo entered, Trooper Green observed that Sandy, a trained drug-sniffing dog, stirred in the back seat and began sniffing at Mr. Loo. Sandy is not trained to alert to humans, but Trooper Green testified that every time he has seen the dog sniff at a person the way she sniffed at Mr. Loo, that person was either using or in possession of a controlled substance.

[¶ 9] While sitting in the patrol car, Trooper Green asked Mr. Loo about being in Reno, where the car had been rented. Mr. Loo said he had gone to Reno for some gambling. The Trooper asked his destination, and Mr. Loo said he was going to Indiana to visit friends. During the conversation, Mr. Loo would not make eye contact with Trooper Green. He continued to show signs of nervousness. The artery at his temple continued pulsing, and sweat beaded up on his forehead. Trooper Green found this unusual. In his experience, a detainee's initial nervousness usually subsides or goes away when told he will get only a warning.

[¶ 10] Because the license plate on the silver car was registered to two vehicles, Trooper Green decided to check the vehicle identification number. Leaving Mr. Loo in the patrol car, Trooper Green walked to the silver car to read the number. This time, the odor of perfume was gone. He began talking to the passenger in the car, and asked where they were going. She said they were going to Indiana, but said she did not know why. Asked about being in Reno, she said that they had not done any gambling. This conversation was short, lasting only about a minute.

[¶ 11] Trooper Green returned to the patrol car, and gave dispatch the vehicle identification number. While waiting for a response, he again asked questions of Mr. Loo. This time, Mr. Loo said they were going to Indiana to visit the passenger's family. He continued to exhibit a high level of nervousness. Trooper Green completed the paperwork on the warning ticket, gave the warning to Mr. Loo along with his driver's license and rental agreement, and told Mr. Loo he was free to go.

[¶ 12] As Mr. Loo was walking back toward his car, Trooper Green asked if he would answer a few more questions. Mr. Loo said yes. Trooper Green reminded Mr. Loo that he did not have to answer any more

questions. Mr. Loo said he understood, but was willing to answer questions. Trooper Green said that he had become "pretty suspicious about everything that was going on here," including the fact that Mr. Loo was very nervous and sweating. Mr. Loo denied being nervous. Nevertheless, Trooper Green believed that the circumstances were "consistent with things that I see on drug interdictions," so he asked Mr. Loo if there was anything illegal in the car. Mr. Loo said no, without making eye contact with the trooper. Trooper Green asked if he could search the vehicle, and Mr. Loo's response was "just stammering and stuttering." Trooper Green took that to mean that Mr. Loo did not consent to a search of the car.

[¶ 13] Trooper Green then said that he was going to have the dog check the car. When Sandy was let out of the patrol car, she ran to the side of the vehicle, sniffed intently at the panel behind the rear wheel on the driver's side, and then sat down at a spot between the wheel well and the trunk. This behavior was consistent with an alert to drugs. When asked, Mr. Loo again denied that there was anything illegal in the car. Trooper Green then asked the passenger if there were any drugs in the car. When she said no, the Trooper said that the dog had indicated there were drugs. The passenger's response was, "I didn't put anything in the trunk." This response seemed odd to Trooper Green because, from where the passenger was seated inside the vehicle, it would have been difficult for her to see that the dog had alerted near the trunk.

[¶ 14] Trooper Green opened the trunk and found several duffle bags. Inside one of the bags, he saw packages of what appeared to be marijuana. He placed Mr. Loo and the passenger under arrest. At this time, Trooper Green learned the identity of the passenger, Yoeun Yoeuth. Later testing established that the material in the trunk was marijuana, about thirty-seven pounds in total.

[¶ 15] In separate cases, Mr. Loo and Ms. Yoeuth were each charged with possession of a controlled substance in violation of Wyo. Stat. Ann. § 35-7-1031(c)(iii) (LexisNexis 2007), possession of a controlled substance with intent to deliver in violation of Wyo. Stat. Ann. § 35-7-1031(a)(ii), and conspiracy to deliver a controlled substance in violation of Wyo. Stat. Ann. §§ 35-7-1042 and -1031(a)(ii). Both Mr. Loo and Ms. Yoeuth filed motions to suppress the evidence found by Trooper Green when he searched the trunk of the car,[1] and consented in writing to a joint hearing before the district court. At the hearing, Trooper Green was called as a witness by the State, cross-examined by counsel for Mr. Loo, and cross-examined by counsel for Ms. Yoeuth. After the district court denied both motions, Mr. Loo entered a conditional guilty plea to two charges: possession with intent to deliver, and conspiracy to deliver. Ms. Yoeuth entered a conditional guilty plea to a single count of conspiracy to deliver. They reserved their rights to appeal the district court's decision denying their motions to suppress.

### STANDARD OF REVIEW

[¶ 16] When we review a district court's decision to deny motions to suppress, we defer to the district court's findings of fact unless they are clearly erroneous. *Fertig v. State*, 2006 WY 148, ¶ 8, 146 P.3d 492, 495 (Wyo.2006); *O'Boyle v. State*, 2005 WY 83, ¶ 18, 117 P.3d 401, 407 (Wyo.2005). "The evidence is viewed in a light favorable to the district court's determination, because that court had the opportunity to hear the evidence and assess the credibility of the witnesses." *Hicks v. State*, 2008 WY 83, ¶ 13, 187 P.3d 877, 880 (Wyo.2008). The issue of law—whether a search was unreasonable and in violation of constitutional rights—is reviewed *de novo*. *Fertig*, ¶ 8, 146 P.3d at 495; *McChesney v. State*, 988 P.2d 1071, 1074 (Wyo.1999).

---

1. Ms. Yoeuth also moved to suppress statements she made to a law enforcement official after her arrest, asserting that the interview was improperly conducted after she had invoked her right to an attorney. The district court denied that motion, and Ms. Yoeuth has stated that she is not advancing this as an appeal issue.

## DISCUSSION

[¶ 17] Mr. Loo and Ms. Yoeuth moved the district court to suppress the evidence—that is, the thirty-seven pounds of marijuana—Trooper Green found when he searched the trunk of the rental car. Both contended that Trooper Green violated their constitutional rights throughout the encounter. On appeal, Mr. Loo continues to maintain that he suffered violations of his rights under both Article 1, Section 4 of the Wyoming Constitution, and under the Fourth Amendment to the United States Constitution. Precedent suggests that such contentions are best analyzed in stages, with the appropriate legal standard applied at each stage. *See O'Boyle,* ¶ 28, 117 P.3d at 409. We will analyze five separate stages of the encounter: 1) the initial stop;[2] 2) the initial detention and questioning; 3) the second round of questioning; 4) the canine sniff of the car; and 5) the search of the trunk. At each stage, we must determine whether, under all of the circumstances, Trooper Green's actions were reasonable and in compliance with our state and federal constitutional prohibitions against unreasonable searches and seizures.

[¶ 18] Ms. Yoeuth's appeal is not a direct challenge to the validity of Trooper Green's actions. Her position is that the district court incorrectly ruled that she did not have standing to pursue that challenge, thereby wrongfully denying her the opportunity to assert that Trooper Green violated her constitutional rights. We will turn first to the appeal issue raised by Mr. Loo, and then to the issues raised by Ms. Yoeuth.

### Mr. Loo

#### The initial stop

[¶ 19] It is established that "a traffic stop initiated by a law enforcement officer after personally observing a traffic violation is supported by probable cause and does not violate Article 1, Section 4 of the Wyoming Constitution." *Fertig,* ¶ 28, 146 P.3d at 501. The district court found that "Trooper Green

followed the silver vehicle for approximately one-half of a mile and observed it tailgating a semi-tractor trailer." Wyo. Stat. Ann. § 31-5-210(a) provides that "The driver of a vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of the vehicles and the traffic upon and the condition of the highway." Violation of this provision is a misdemeanor. Wyo. Stat. Ann. § 31-5-1201(a). The district court concluded that Trooper Green's observation of the traffic violation provided probable cause to initiate a traffic stop. The district court's findings are fully supported by the testimony of Trooper Green during the suppression hearing, and are not clearly erroneous. The district court properly analyzed the facts under the applicable law, and we find no error in its conclusions.

[¶ 20] At the suppression hearing, defense counsel argued that, before observing the traffic violation, Trooper Green's initial suspicions were unfounded. They suggested that he exaggerated the severity of Mr. Loo's braking, and that his suspicion about a problem with the license plate stemmed from his own misreading of an "8" as a "B." In essence, the defendants asserted that Trooper Green stopped them only as a pretext to look for evidence of illegal drugs. However, after hearing the testimony of Trooper Green, the district court had "little doubt that the facts of this case show anything but a pretextual traffic stop." A law enforcement official who observes a traffic violation has probable cause to make a stop regardless of the officer's subjective motivation. *Fertig,* ¶ 28, 146 P.3d at 501. When Trooper Green observed Mr. Loo's vehicle following another too closely in violation of Wyo. Stat. Ann. §§ 31-5-210(a) and -1201(a), he had probable cause to make the stop. We affirm the district court's conclusion that "the initial traffic stop of [Mr.] Loo did not violate Article 1, § 4 of the Wyoming Constitution."

2. Mr. Loo contested the validity of the initial traffic stop before the district court, but does not pursue that issue on appeal. It is still necessary to analyze this part of the encounter, however, because the validity of the initial stop is integral to the decision in Ms. Yoeuth's appeal. For the sake of organization, we choose to include our analysis here.

[¶ 21] The result is the same under the federal constitution. The district court accurately stated that the test, simply put, is whether "the initial stop [is] justified," and the focus is on "a fact-specific reasonableness inquiry." *O'Boyle*, ¶ 46, 117 P.3d at 414. The district court determined that Trooper Green was justified in stopping Mr. Loo, based on the specific fact that he had observed a traffic violation. This determination is sound.

### The initial detention and questioning

■■■■ [¶ 22] The detention and questioning of a person after being stopped by a law enforcement officer must be reasonable in "scope, duration, and intensity." *Fertig*, ¶ 28, 146 P.3d at 501. Factors reviewed by the court include whether the officer engaged in persistent and unduly sustained questioning, and whether the questions asked extended to topics unrelated to the traffic offense. *O'Boyle*, ¶ 32, 117 P.3d at 410. Typically, a traffic stop must last no longer than it would reasonably take for an officer to "request a driver's license and vehicle registration; run a computer check; and issue a citation," and a driver should "be allowed to proceed without further delay once the officer determines that the driver has a valid license and is entitled to operate the vehicle." *Damato v. State*, 2003 WY 13, ¶ 13, 64 P.3d 700, 706 (Wyo.2003).

[¶ 23] The district court did not make a specific finding of how long the initial detention lasted.[3] It did find that the "time from the initial traffic stop to arrest lasted approximately thirty minutes." The initial detention, only one stage in that encounter, was necessarily even shorter. The district court also found that "Trooper Green asked approximately 12 to 17 questions," and that he "did not engage in sustained, persistent questioning and the questions he did ask did not expand the scope of the detention beyond the traffic offense." The Trooper's questions were limited to the topics of Mr. Loo's "right to operate the silver vehicle and their travel plans." Based on these findings, the district court concluded "that this detention was reasonable." The findings are supported by the evidence of record, and are not clearly erroneous. The district court's conclusions are fully consistent with Wyoming law.

■ [¶ 24] The conclusions are the same under federal law. "The reasonableness of a traffic stop detention under the Fourth Amendment is determined by applying the two-part inquiry set forth in *Terry v. Ohio*, 392 U.S. 1, 19–20, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968): (1) whether the initial stop was justified; and (2) whether the officer's actions during the detention were reasonably related in scope to the circumstances that justified the interference in the first instance." *Hembree v. State*, 2006 WY 127, ¶ 12, 143 P.3d 905, 908 (Wyo.2006) (some internal punctuation omitted). For purposes of this case, there is no appreciable difference between the federal standards and the Wyoming standards. Because Mr. Loo's initial detention was permissible under the Wyoming Constitution, it was also permissible under the Fourth Amendment to the United States Constitution.

### The second round of questioning

■■■■ [¶ 25] At the end of his initial detention, Trooper Green returned the driver's license and rental agreement to Mr. Loo, and said he was free to go. While Mr. Loo was walking back to his car, Trooper Green asked if he would answer a few more questions. It is undisputed that Mr. Loo gave his consent, but that does not end the inquiry. "[I]f a search or seizure is based upon the proposition that consent was given, there should be no question from the evidence that consent was 'really voluntary.'" *O'Boyle*, ¶ 38, 117 P.3d at 412, quoting *Tobin v. State*, 36 Wyo. 368, 374, 255 P. 788, 789 (1927). Factors to be considered include whether the individual was told he could refuse the request for further contact, and whether the officer was courteous and respectful, or threatening, antagonistic, and coercive. *Seymour v. State*, 2008 WY 61, ¶ 19, 185 P.3d 671, 677 (Wyo.2008).

---

3. In many cases like this, a videotape of the encounter is included in the record, allowing us to determine the duration of a detention. No videotape is available in this case. Trooper Green testified that the video camera installed in his patrol vehicle was not working at the time.

[¶ 26] The district court found that Trooper Green informed Mr. Loo that he was free to go. It also found that "Trooper Green acted in a professional and non-antagonistic manner ... and there is no indication that Trooper Green was threatening." It further found that Mr. "Loo's consent was not the product of repeated badgering. Trooper Green only asked once whether he could ask ... some further questions and [Mr.] Loo responded affirmatively." Based on these findings, the district court concluded that "a reasonable person in [Mr.] Loo's position would have felt free to leave," and that Mr. "Loo's consent to further questioning was obtained voluntarily." The findings are consistent with evidence in the record, and the district court's conclusions based on those findings are sound. We find no error in the district court's decision that Mr. Loo's consent to the second round of questioning was voluntary, and that the questioning did not violate his rights under the Wyoming Constitution.

[¶ 27] Again, the result is the same under federal standards. "Under both constitutions, we examine the totality of the circumstances to determine if consent was voluntary." *Latta v. State*, 2009 WY 35, ¶ 12, 202 P.3d 1069, 1072 (Wyo.2009). Factors to be considered include: "the demeanor of the law enforcement officer, whether the individual was told he could refuse the request, the presence of other law enforcement officers, the length of the detention and nature of the questioning before consent was given, and other coercive factors." *Id.* Applying these factors, the district court determined that Mr. Loo had validly consented to answer further questions, and Mr. Loo has provided no basis on appeal for overruling that determination.

### The canine sniff

[¶ 28] Mr. Loo contends, and the State agrees, that if a person is not free to leave the scene while the dog performs its sniff, that person is effectively detained. *See, e.g., Seymour*, ¶ 25, 185 P.3d at 678. This detention is permissible only if based upon reasonable suspicion of illegal activity. *Id.* We must consider, first, whether the

officer's actions were justified by a reasonably articulable suspicion of illegal activity, and second, whether the detention was reasonably related in scope to the circumstances that justified the detention. *Damato*, ¶ 9, 64 P.3d at 704–05.

[¶ 29] The district court provided this list of factors articulated by Trooper Green as giving rise to reasonable suspicion:

> 1) the odor of perfume that dissipated over time; 2) the Avis rental agreement in addition to the Hertz rental agreement; 3) [Mr.] Loo's unusually high nervousness; 4) Trooper Green's drug detection dog sniffing at [Mr.] Loo when [he] entered the patrol car; and 5) Trooper Green's knowledge from experience that drug traffickers often rent more than one vehicle in the course of transporting contraband.

In addition, the district court noted that Trooper Green received conflicting information from Mr. Loo and Ms. Yoeuth. He said they had gambled in Reno. She denied gambling. He said they were going to Indiana to visit friends, then said they were going to visit her family. She said they were going to Indiana, but did not know why. The record contains evidence sufficient to support the district court's findings on all of these factors.

[¶ 30] Based on all of these factors, the district court concluded that Trooper Green had reasonable and articulable suspicions of ongoing criminal activity. The district court further concluded that the detention of Mr. Loo during the dog sniff was reasonably related to the circumstances. Finally, we note that this detention could not have lasted more than a few minutes, because the dog was already on-scene, ready to be released from Trooper Green's patrol car. *Compare State v. Welch*, 873 P.2d 601, 605 (Wyo.1994), in which the patrolman's reasonable suspicions justified a fifty-minute detention of Mr. Welch while the drug sniffing dog was brought to the scene by another officer.

[¶ 31] Mr. Loo's attorney attacks some of the factors listed by the district court. For example, he questions Trooper Green's testimony about the perfume smell because, when the car was searched later,

the source of the smell was never found. On this basis, he contends that "Trooper Green's unsubstantiated statement that he smelled perfume is not an articulable fact leading to probable cause to search the car." This argument amounts to an attack on Trooper Green's credibility. But the district court found Trooper Green's testimony credible, and "issues of credibility and the weight to be given to testimony are matters to be resolved by the trier of fact, not an appellate court. Thus, we may not substitute our judgment for that of a trial court with respect to issues concerning credibility." *Carter Wallop v. Wallop*, 2004 WY 46, ¶ 10, 88 P.3d 1022, 1025 (Wyo.2004). Trooper Green further testified that, in his experience, perfume is sometimes used to mask the smell of an illegal substance. Contrary to Mr. Loo's contention, the perfume smell therefore constituted an articulable fact that, together with the other factors, gave rise to reasonable suspicion.

[¶ 32] Mr. Loo relies on *Damato*, ¶ 20, 64 P.3d at 708, for the proposition that the "'extreme nervousness' factor is generally considered of limited significance."[4] The district court actually agreed, saying that all of the listed factors "are certainly of limited value by themselves," but together, were properly considered as part of "the totality of the circumstances." This is entirely consistent with *Damato*, in which we said that each of the factors considered might be "innocent," but "under the totality of the circumstances test, individually innocuous factors can combine to arouse a reasonable suspicion for the experienced officer." *Id.*, ¶ 26, 64 P.3d at 710. Based on all of the circumstances, the district court concluded that "Trooper Green possessed the articulable suspicion of ongoing criminal activity" sufficient to detain Mr. Loo during the dog-sniff, and that the detention was reasonable in scope, duration, and intensity. We perceive no basis for reversing that conclusion.

 [¶ 33] Under the federal constitution, "To justify a detention after the initial reason for the stop has concluded, an officer must be able to point to the presence of specific and articulable facts and rational inferences which give rise to a reasonable suspicion that a person has committed or may be committing a crime." *Flood v. State*, 2007 WY 167, ¶ 22, 169 P.3d 538, 545 (Wyo.2007) (internal quotation marks omitted). As found by the district court, Trooper Green established that this requirement was satisfied. The district court properly concluded that the detention during the dog sniff did not violate Mr. Loo's rights under the federal constitution.

### The search of the trunk

 [¶ 34] Under the United States Constitution, when a trained and reliable drug dog alerts during an exterior sniff of a vehicle, there is probable cause to search that vehicle. *See*, e.g., *United States v. Klinginsmith*, 25 F.3d 1507, 1510 (10th Cir.1994). We have suggested that the same is true under the Wyoming Constitution. *State v. Williams*, 2004 WY 53, ¶¶ 20, 22, 90 P.3d 85, 90–92 (Wyo.2004). In any event, Mr. Loo has not provided the sort of "precise, analytically sound approach" required for us to make an independent analysis under our state constitution. *See VanKooten v. State*, 2009 WY 59, ¶ 12, 206 P.3d 388, 391 (Wyo. 2009). Trooper Green's testimony established that Sandy was a trained, reliable, and certified drug dog. Sandy's alert near the trunk of Mr. Loo's rental car provided Trooper Green with probable cause to search the trunk.

[¶ 35] In sum, Trooper Green's initial stop of Mr. Loo was justified, and the initial detention was reasonable in scope, duration, and intensity. Mr. Loo validly consented to his second round of questioning. Considering all of the circumstances, Trooper Green had grounds to detain Mr. Loo further while the dog sniffed the vehicle. Once the dog alerted near the trunk, Trooper Green had probable cause to search the trunk. We

---

4. That case also says that "the telling information is whether the citizen calmed after the initial few minutes of the encounter. Extreme and continued nervousness, however, is entitled to somewhat more weight." *Damato*, ¶ 21, 64 P.3d at 708 (some internal punctuation omitted). Trooper Green testified that Mr. Loo remained nervous even after learning that he was only getting a warning.

affirm the district court's denial of Mr. Loo's motion to suppress the evidence discovered during the search.

### Ms. Yoeuth

[¶ 36] Ms. Yoeuth's appeal involves two separate questions about standing. The first question is whether she, as a passenger in the car, has standing to challenge the constitutionality of any of Trooper Green's actions. If she does, the second question is whether she lost her standing to challenge Trooper Green's search of the car's trunk by denying any ownership interest in the trunk and its contents. We will consider the two questions in this same order because that is how they arose in the course of proceedings below.

#### Standing as a passenger

[¶ 37] Ms. Yoeuth and Mr. Loo were charged in separate actions, and each filed a motion to suppress. Both consented to a joint hearing on their motions. As counsel for Ms. Yoeuth began her closing argument at the hearing, the district court asked if she believed "that Ms. Yoeuth has standing to allege a violation of her rights?" Counsel said yes, asserting that Ms. Yoeuth, a passenger in the rental car, had a sufficient expectation of privacy in the vehicle to support her standing. Moments later came this exchange:

> [COUNSEL]: However, where Mr. Loo's own stop and seizure would be illegal, Ms. Yoeuth should be allowed to basically carry on the backtails of that because it would not be in the interests of justice for Mr. Loo's evidence to be suppressed and Ms. Yoeuth would almost literally be left holding the bag, even though she was not the driver of the vehicle. There was no allegation that she was in violation of a Wyoming or federal law at the time of the stop.
>
> THE COURT: But hasn't the Wyoming Supreme Court ruled to the contrary?
>
> [COUNSEL]: That a passenger does have standing?
>
> THE COURT: Does not have standing.

> [COUNSEL]: Oh, does not have standing? ... But she does have standing to argue her own detention. She was never told she was free to leave, and the testimony from the trooper is that they were about 17 miles east of Rawlins and about three miles shy of Walcott Junction. She was in an area where, as a passenger, she could not have gotten up and left. She was there.
>
> She was also told by the trooper to sit tight because the paperwork would be done shortly. Again, she was not told that she was free to leave ... And she was also not told that it was only going to be a warning that was going to be issued.
>
> And it is for those reasons that Ms. Yoeuth is incorporated into Mr. Loo's argument that if his stop is deemed illegal and the search is deemed illegal, then hers—the evidence against her should be suppressed as well. And that's Ms. Yoeuth's argument for the suppression of the stop and search.

[¶ 38] On appeal, Ms. Yoeuth contends that this exchange amounted to an oral ruling by the district court that she did not have standing to challenge the validity of Trooper Green's actions because she was only a passenger in the car.[5] If there was such a ruling, it was in error. A passenger who is rightfully present in a vehicle has a reasonable expectation of privacy, and therefore has standing to challenge governmental invasions of that expected privacy:

> Dennis Parkhurst as owner of the vehicle which was searched had a legitimate expectation of privacy in his property, as would all property owners. And we find that Derrick Parkhurst as a guest in his brother's automobile could reasonably expect that the car in which he was a guest would be free from state encroachment. Thus, both appellants have standing to protest the search of the car's trunk under § 4, Art. I of the Wyoming Constitution.

*Parkhurst v. State,* 628 P.2d 1369, 1374 (Wyo.1981). The same is true under the federal constitution. *Brendlin v. California,*

---

5. If the district court did intend this as an oral ruling, that was not reflected in its written decision letter. The decision letter is silent on the question of Ms. Yoeuth's standing as a passenger.

551 U.S. 249, 259, 127 S.Ct. 2400, 2408, 168 L.Ed.2d 132, 141 (2007).

[¶ 39] However, our review of the transcript suggests that the district court was not making an oral ruling that she lacked standing, but was instead seeking clarification of whether Ms. Yoeuth asserted standing based upon alleged violations of her own rights, or of the rights of Mr. Loo. A person seeking to suppress evidence must claim a violation of her own rights, and cannot stand on the rights of others. *Garvin v. State*, 2007 WY 190, ¶ 12, 172 P.3d 725, 728 (Wyo.2007); *Parkhurst*, 628 P.2d at 1374. This interpretation of the district court's questions and comments is consistent with defense counsel's response, an assertion that Ms. Yoeuth "does have standing to argue her own detention." We agree, but we do not think the district court denied Ms. Yoeuth's standing simply because she was a passenger in the vehicle.

### Loss of standing by denial of ownership

[¶ 40] We turn to the second question, that of whether Ms. Yoeuth lost standing to challenge the search of the trunk. After the joint hearing on the motions to suppress, the district court issued separate decision letters. In Ms. Yoeuth's case, the district court did not explicitly address the constitutional validity of her stop, detention, or search. It ruled instead that Ms. Yoeuth lacked standing to challenge the validity of Trooper Green's search of the trunk because she:

> renounced any interest in the trunk of the rental vehicle by telling Trooper Green that she did not put anything in the trunk. [Ms.] Yoeuth did not take any precautions to maintain privacy in the vehicle's trunk. Instead, her statement disavowed any interest in that area and ownership over its contents.

The district court cited *Andrews v. State*, 2002 WY 28, ¶ 20, 40 P.3d 708, 712–13 (Wyo. 2002), to establish that a person who denies or renounces ownership of property has no standing to challenge the constitutionality of a search of that property. As for the counterpart under the federal constitution, the *Andrews* opinion stated that "The Tenth Cir-cuit Court of Appeals has consistently held that a defendant abandons any expectation of privacy when he unequivocally denies ownership of the property. *See, e.g., United States v. Garzon*, 119 F.3d 1446, 1449–52 (10th Cir. 1997)." *Id.*, ¶ 20, 40 P.3d at 713.

[¶ 41] On appeal, Ms. Yoeuth claims that the district court's decision was in error. She contends that her comment to Trooper Green—"I didn't put anything in the trunk"—is not a sufficiently unequivocal denial of ownership to establish that she abandoned her expectations of privacy in the trunk or its contents. We will evaluate Ms. Yoeuth's claim by comparing her circumstances with those in the two cases cited above.

[¶ 42] In the Wyoming case, *Andrews*, a deputy sheriff went to the home of Mr. Andrews' parents. Mr. Andrews was staying there, apparently on a temporary basis. The parents gave the deputy permission to search their home. While searching, the deputy asked Mr. Andrews for permission to search his belongings. Mr. Andrews eventually consented, and handed the deputy two duffle bags. *Andrews*, ¶¶ 6–8, 40 P.3d at 710–11. After looking inside the two bags, the deputy asked Mr. Andrews about a third duffle bag located nearby. Mr. Andrews stated that the bag did not belong to him. The deputy asked Mr. Andrews this question: "Do you understand that if it's not yours you have no standing to object to me searching it?" Mr. Andrews affirmed his understanding. *Id.*, ¶ 9, 40 P.3d at 711. Because Mr. Andrews explicitly and repeatedly renounced ownership of the bag, we concluded "that he abandoned his reasonable expectation of privacy in the third duffel bag at the time of the search. He did not, therefore, have standing to challenge the constitutionality of the search of the third duffel bag." *Id.*, ¶ 23, 40 P.3d at 713.

[¶ 43] The situation was quite different in *Garzon*, the Tenth Circuit Court of Appeals case. Mr. Garzon was traveling on a bus that made a layover in Denver. A police officer instructed Mr. Garzon and the rest of the passengers to take all of their carry-on luggage off the bus and present it to a drug-sniffing dog. Mr. Garzon took one of his

backpacks, but left two others on the bus. When the officer noticed the two backpacks remaining on the bus, he removed them and took them to the drug-sniffing dog. The dog alerted. The officer searched the backpack and found illegal drugs. *Id.*, 119 F.3d at 1448.

[¶ 44] There were no identifying marks on the two backpacks. The officer asked a couple of other passengers if they owned the backpacks, but he never asked that question of Mr. Garzon. The appeals court

> emphasize[d] that [Mr.] Garzon did nothing to manifest objectively an intent to abandon his backpacks that were left on the bus. [He] never once denied ownership of those backpacks. Indeed, he did not even stand silent when asked if anyone claimed them because no such inquiry was ever directed at [Mr.] Garzon or, so far as this record shows, was any such inquiry ever uttered within [his] hearing. Further, he never objectively evidenced an abandonment intent by clear and unequivocal physical acts, such as throwing them away, giving them to strangers, leaving them unguarded on public property or the like. To the contrary, he left them in a secure overhead internal luggage rack just as he was told he could by the bus driver.

*Id.*, 119 F.3d at 1450. The court ruled that Mr. Garzon had not denied ownership of the backpacks, abandoned them, or renounced his expectation of privacy in them. Accordingly, the officer's search without consent violated Mr. Garzon's constitutional rights.

[¶ 45] Ms. Yoeuth's circumstances are closer to Mr. Garzon's than to Mr. Andrews'. Mr. Andrews explicitly and repeatedly said he did not own the bag, in response to direct and unambiguous questions from the deputy. Ms. Yoeuth was never asked any question about ownership, and she never denied ownership. Like Mr. Garzon, she did not explicitly disclaim an interest in the trunk or its contents. Ms. Yoeuth's comment that she did not put anything in the trunk was ambiguous about ownership of the trunk's contents. It could have meant, for example, that she owned the property in the trunk, but Mr. Loo had put it there for her. Her comment did not amount to an unequivocal denial of

ownership. We therefore disagree with the district court that Ms. Yoeuth abandoned her expectations of privacy in the trunk and its contents, and accordingly, we conclude that she did have standing to challenge the constitutionality of Trooper Green's search of the trunk.

### Opportunity to assert her constitutional challenges

[¶ 46] Having concluded that Ms. Yoeuth had standing, in her own right, to challenge the initial stop, her subsequent detention, and the search of the trunk, we turn to the next part of her argument, as stated in the reply brief:

> Ms. Yoeuth desired to dispute the existence of probable cause for the stop on two grounds *and was prohibited from doing so by the trial court's erroneous oral ruling on standing.* The two grounds she desires to raise are the incredibility of the officer's testimony and the conduct of the officer in creating the circumstances that he used to justify the stop.

(Emphasis added.) This contention is contradicted by the record.

[¶ 47] As noted above, Ms. Yoeuth agreed to a joint hearing with Mr. Loo on their motions to suppress. At the joint hearing, counsel for Ms. Yoeuth was given an opportunity to participate fully and completely in the hearing, and she did so. She had an opportunity to cross-examine Trooper Green, and she did so. The prosecution made one objection during this cross-examination, and it was overruled. None of the evidence offered by Ms. Yoeuth was excluded by the district court. Even if it harbored doubts about Ms. Yoeuth's standing, the district court placed no boundaries or limits on the questions her counsel asked Trooper Green. The district court's questions about standing arose during closing argument, but did not prevent or deter Ms. Yoeuth's counsel from making any arguments she chose on Ms. Yoeuth's behalf. In short, Ms. Yoeuth did have an opportunity to present all of the facts she chose to offer, and all of the arguments she chose to make, in support of her claim that her constitutional rights had been violated.

[¶ 48] As counsel for Ms. Yoeuth told the district court in the exchange quoted above, "Ms. Yoeuth is incorporated into Mr. Loo's argument that if his stop is deemed illegal and the search is deemed illegal, then hers— the evidence against her should be suppressed as well." The district court denied Mr. Loo's motion to suppress. It is apparent from the record that the district court either denied Ms. Yoeuth's motion implicitly, or would have done so explicitly.

[¶ 49] The record contains the entire transcript of the joint hearing on the motions to suppress, so all of the evidence is before us. The decision letters in Ms. Yoeuth's case and Mr. Loo's case contain very nearly identical recitations of the facts, and deal with Trooper Green's interactions with both Ms. Yoeuth and Mr. Loo. From these detailed findings of fact, we can determine how the district court evaluated the credibility of the witnesses, and weighed the evidence. *Compare Wells Fargo Bank Wyoming, N.A., v. Hodder*, 2006 WY 128, ¶ 32, 144 P.3d 401, 413 (Wyo.2006) ("[T]he trial court's decision letter sets forth detailed findings of fact, including its assessment of witness credibility, making it possible for this Court to review without re-weighing disputed evidence."). We have affirmed the district court's conclusions of law in Mr. Loo's case. The same legal standards apply in Ms. Yoeuth's case.

[¶ 50] Trooper Green testified that he observed a traffic violation when the silver car followed another vehicle too closely. Ms. Yoeuth wants to assert now that the officer's testimony was not credible, but the district court found that testimony credible as a factual matter, and sufficient as a matter of law to establish probable cause to stop the car. Ms. Yoeuth presented no authority, either to the district court or on appeal, suggesting that an officer with probable cause for a traffic stop is permitted to stop the driver but constitutionally prohibited from stopping the passenger.

[¶ 51] Ms. Yoeuth's detention by Trooper Green was of lesser scope than Mr. Loo's, involving even fewer questions and broaching no topics beyond those found acceptable in Mr. Loo's case. Her detention was of comparable duration. It was of lesser intensity, as she remained in the rental car while Mr. Loo was taken to the patrol car. There is no indication that Trooper Green behaved any differently toward Ms. Yoeuth than he did toward Mr. Loo. Because Ms. Yoeuth's detention was reasonable in scope, duration, and intensity, it did not violate her constitutional rights.

[¶ 52] The district court found that Trooper Green had reasonably articulable suspicions of illegal activity allowing him to detain Mr. Loo during the dog sniff. The same suspicions applied to Ms. Yoeuth. The district court concluded that the dog's alert at the trunk provided Trooper Green with probable cause to search the trunk. That conclusion applies equally to Mr. Loo and Ms. Yoeuth. In sum, Ms. Yoeuth did have a full opportunity to present the district court with all of the facts and arguments in support of her motion to suppress. She did so, but provided no basis for the district court to reach a different result in her case than it did in Mr. Loo's. On appeal, she provided no basis for this Court to reach a different result. Accordingly, we affirm the district court's denial of Ms. Yoeuth's motion to suppress the evidence.

### CONCLUSION

[¶ 53] We affirm the district court's denial of the motions to suppress in both Mr. Loo's case and Ms. Yoeuth's case.