2010 WY 38

**Jacob LOVATO, Appellant (Defendant),**

v.

**The STATE of Wyoming,
Appellee (Plaintiff).**

No. S–09–0073.

Supreme Court of Wyoming.

March 26, 2010.

Representing Appellant: Diane M. Lozano, State Public Defender; Tina N. Kerin, Appellate Counsel.

Representing Appellee: Bruce A. Salzburg, Attorney General; Terry L. Armitage, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; Jenny Lynn Craig, Assistant Attorney General.

Before VOIGT, C.J., and GOLDEN, HILL, KITE, and BURKE, JJ.

BURKE, Justice.

[¶1]   Jacob Lovato entered a conditional guilty plea to two drug-related charges, reserving his right to appeal the denial of the suppression motion.  In this appeal, he challenges the district court's decision.  We will affirm.

### ISSUES

[¶2]   Mr. Lovato presents this two-part issue:

The trial court erred in finding that (1) there was "probable cause" to conduct a traffic stop of Appellant's car;  and (2) the scope of the traffic stop was not exceeded by the trooper's actions.

### FACTS

[¶3]   This overview of the facts is based largely on the district court's decision letter, in which it explained why it was denying Mr. Lovato's suppression motion.  On the morning of March 19, 2008, Trooper Jason Green of the Wyoming Highway Patrol was not on duty, but had stopped at his office to take care of some paperwork.  He was contacted by Special Agent Eric Ford of the Wyoming Division of Criminal Investigation, who had been tipped by a confidential informant that a man named Jacob Lovato was driving around town in a maroon-colored Buick sedan, and was in possession of a large amount of methamphetamine and cocaine.  Trooper Green contacted Trooper Jacob Cheser, asked him to watch for the vehicle, and suggested making a traffic stop if Trooper Cheser could find a basis for it.

[¶4]   Trooper Cheser was in his patrol car when he saw a maroon Buick sedan coming toward him in the opposite lane of traffic.  As they passed, Trooper Cheser observed a crack in the windshield of the vehicle.  After passing, Trooper Cheser watched the vehicle in his rearview mirror, and noticed a tinted cover over the license plate.  He turned the patrol car around and followed the vehicle.  He was unable to read the license plate number until he was very close behind it.  Trooper Cheser initiated a traffic stop based on the cracked windshield and the obscured license plate.  After talking to Mr. Lovato, Trooper Cheser said he was going to issue him a warning ticket.

[¶ 5] While Trooper Cheser was in his patrol car filling out the warning ticket, Trooper Green arrived with his drug detection dog. Though he had not been on duty, he had received his supervisor's approval to have his dog sniff Mr. Lovato's vehicle. According to Trooper Green, the dog alerted at the doors on both sides of the car. Trooper Green informed Trooper Cheser, who asked Mr. Lovato and the passenger to get out of the car. He patted them down for weapons, and found none. He placed Mr. Lovato in Trooper Green's patrol car, and the passenger in his patrol car. The Troopers then searched Mr. Lovato's car, and discovered a small digital scale with traces of white powder on it.

[¶ 6] Suspecting that the white powder on the scale was an illegal drug, Trooper Green began questioning Mr. Lovato. He conducted a more thorough pat-down search, but found nothing. He told Mr. Lovato to return to his vehicle while Trooper Cheser finished writing the warning ticket. As Mr. Lovato walked back to the car, Trooper Green observed that he walked stiff-legged with his hand holding his groin area. Now suspicious that he had missed something during the pat-down search, Trooper Green asked Mr. Lovato to stop and place his hands on top of the patrol car. Trooper Green shook Mr. Lovato's pants, and a pill bottle fell to the ground. Inside was a crystalline substance that turned out to be methamphetamine.

[¶ 7] Mr. Lovato was arrested. Upon reaching the detention center, Trooper Green told Mr. Lovato that if he had any more illegal drugs with him, he could face additional charges if he took them into the detention center. Mr. Lovato indicated he had something in his right shoe. Trooper Green removed the shoe, and inside it found a plastic bag containing 23 bindles of cocaine.

[¶ 8] At some time not specified in the record, Special Agent Bisceglia of the Wyoming Division of Criminal Investigation also arrived at the scene. After Mr. Lovato's arrest, Agent Bisceglia drove Mr. Lovato's car to an impound area. He testified that he also observed the crack in the windshield and the dark plastic cover over the rear license plate.

[¶ 9] Mr. Lovato was initially charged with two counts of felony possession of controlled substances, two counts of possession with intent to deliver, and four counts of conspiracy to deliver controlled substances. Two of the conspiracy counts were soon dismissed by the prosecution. Among other pre-trial pleadings, Mr. Lovato filed a motion to suppress, asserting that there was no probable cause for the traffic stop, so that his subsequent detention, the search of his car, and the search of his person were unreasonable in scope. After a hearing was conducted, the district court denied the suppression motion. Mr. Lovato pleaded guilty to one felony count of possession of methamphetamine with intent to deliver, and one felony count of possession of cocaine with intent to deliver, both in violation of Wyo. Stat. Ann. § 35-7-1031(a)(i) (LexisNexis 2007). The prosecution dismissed the remaining counts. Mr. Lovato was sentenced to two to eight years in prison. That sentence was suspended, and he was placed on three years of supervised probation.

[¶ 10] Mr. Lovato entered the guilty pleas on the condition that he would be allowed to appeal the district court's denial of his suppression motion. He has now brought his appeal before this Court.

### STANDARD OF REVIEW

[¶ 11] We apply this standard of review to resolve Mr. Lovato's issues:

When we review a district court's decision to deny motions to suppress, we defer to the district court's findings of fact unless they are clearly erroneous. *Fertig v. State,* 2006 WY 148, ¶ 8, 146 P.3d 492, 495 (Wyo.2006); *O'Boyle v. State,* 2005 WY 83, ¶ 18, 117 P.3d 401, 407 (Wyo.2005). "The evidence is viewed in a light favorable to the district court's determination, because that court had the opportunity to hear the evidence and assess the credibility of the witnesses." *Hicks v. State,* 2008 WY 83, ¶ 13, 187 P.3d 877, 880 (Wyo.2008). The issue of law—whether a search was unreasonable and in violation of constitutional rights—is reviewed *de novo. Fertig,* ¶ 8,

146 P.3d at 495; *McChesney v. State*, 988 P.2d 1071, 1074 (Wyo.1999).

*Yoeuth v. State*, 2009 WY 61, ¶ 16, 206 P.3d 1278, 1282 (Wyo.2009).

## DISCUSSION

[¶ 12] Mr. Lovato contends that the outcome of his case is the same under state or federal constitutional analysis. In his brief he chose to "focus on federal constitutional principles, as adopted and recognized by this Court." The principles applicable here have been stated as follows:

> The Fourth Amendment protects individuals from unreasonable searches and seizures. U.S. Const. amend. IV. A routine traffic stop constitutes a seizure within the meaning of the Fourth Amendment "even though the purpose of the stop is limited and the resulting detention quite brief." *Damato v. State*, 2003 WY 13, ¶ 9, 64 P.3d 700, 704 (Wyo.2003) (quoting *Delaware v. Prouse*, 440 U.S. 648, 653, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979)). Because a traffic stop is more analogous to an investigative detention than a custodial arrest, the reasonableness of such stops [is] analyzed under the two-part test articulated in *Terry v. Ohio*, 392 U.S. 1, 19–20, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968): (1) whether the initial stop was justified; and (2) whether the officer's actions during the detention were "reasonably related in scope to the circumstances that justified the interference in the first instance." *Damato*, ¶ 9, 64 P.3d at 705.

*Garvin v. State*, 2007 WY 190, ¶ 13, 172 P.3d 725, 728–29 (Wyo.2007).

### Was the initial stop justified?

[¶ 13] Mr. Lovato's initial contact with Trooper Cheser was an investigatory traffic stop, not an arrest. The distinction is significant because it takes less to justify a traffic stop than an arrest.

> For Fourth Amendment purposes, we recognize three tiers of interaction between police and citizens. *Custer* [*v. State*, 2006 WY 72], ¶ 13, 135 P.3d [620,] 624–25 [ (Wyo.2006) ]. *See also, Collins v. State*, 854 P.2d 688, 691–92 (Wyo.1993). The least intrusive contact between a citizen and police is a consensual encounter. *Custer*, ¶ 13, 135 P.3d at 624–25. A consensual encounter is not a seizure and does not implicate Fourth Amendment protections. The second tier is the investigatory or Terry stop, named after the seminal case *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). An investigatory detention is a seizure under the Fourth Amendment. *Custer*, ¶ 13, 135 P.3d at 624–25. However, because of its limited nature, a law enforcement officer is only required to show "the presence of specific and articulable facts and rational inferences which give rise to a reasonable suspicion that a person has committed or may be committing a crime" in order to justify the detention. *Id.*, quoting *Wilson v. State*, 874 P.2d 215, 220 (Wyo.1994). The most intrusive encounter between police and a citizen is an arrest. An arrest " 'requires justification by probable cause to believe that a person has committed or is committing a crime.' " *Id.* at 625, quoting *Wilson*, 874 P.2d at [220].

*Flood v. State*, 2007 WY 167, ¶ 14, 169 P.3d 538, 543–44 (Wyo.2007). Thus, Trooper Cheser was justified in stopping Mr. Lovato if he had reasonable suspicion that Mr. Lovato had committed or may be committing a crime.

[¶ 14] Trooper Cheser readily admitted that this stop was prompted by the information provided by the confidential informant that Mr. Lovato was carrying illegal drugs. Trooper Cheser believed that this information, by itself, was insufficient to justify a stop. Accordingly, in his words, "I knew I would have to develop my own probable cause." [1] However, as the district court accurately noted, an officer is permitted to make a traffic stop if he personally observes a traffic violation, without regard to his subjective intent. *Hernandez v. State*, 2010 WY 33, ¶ 8, 227 P.3d 315, 319 (Wyo.2010), citing *Whren v. United States*, 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996), and *Fertig*, ¶ 28, 146 P.3d at 501.

---

1. Because of Trooper Cheser's misstatement, we note again that he did not need probable cause to make a traffic stop. He needed only reasonable suspicion.

[¶ 15] Trooper Cheser testified that he observed two traffic violations. Almost as soon as he spotted Mr. Lovato's car, he "could see the sunlight glinting off of a crack on the windshield on the upper left side of the windshield." This, Trooper Cheser testified, suggested a possible violation of Wyo. Stat. Ann. § 31–5–955(a), which provides that "No person shall drive any motor vehicle with any ... crack within the front windshield ... which materially obstructs, obscures or impairs the driver's clear view." A short time later, Trooper Cheser observed that he was unable to read the car's rear license plate number because of "a dark-tinted license plate cover on the rear license plate." This, Trooper Cheser testified, suggested a possible violation of Wyo. Stat. Ann. § 31–2–205(a)(i), which requires license plates to be displayed and maintained so as to be "plainly visible."

[¶ 16] Mr. Lovato points out in his appeal, as he did vigorously to the district court, that there were inconsistencies in the testimony about the crack in the windshield. Trooper Cheser said it was "on the upper left side of the windshield," and estimated it was approximately three to four inches long. Agent Bisceglia was uncertain about the location of the crack, but thought it was "going down the center and possibly across the top." Mr. Lovato's wife testified that the crack was "on the lower driver's side of the windshield [by] the window wipers, by where the defrost would be." She also testified that the crack was only about two inches long. Mr. Lovato also testified that the crack was "on the lower windshield of the driver's side," and agreed that it was about two inches long. Neither the prosecution nor the defense offered a photograph or other evidence to resolve these conflicts in the testimony.

[¶ 17] After hearing the evidence, the district court found that "Trooper Cheser observed a crack in the Buick sedan's windshield." The district court acknowledged the conflicting testimony about the size and location of the crack, but wrote that:

the exact position of the windshield crack is immaterial in determining whether Trooper Cheser possessed the necessary level of suspicion to stop [Mr.] Lovato.

The uncontroverted fact is that a windshield crack existed that was noticeable from both the interior and exterior of the vehicle.

We will defer to the district court's findings of fact unless they are clearly erroneous. "A finding is clearly erroneous when, even though substantial evidence supports it, the reviewing court is left with the definite and firm conviction that a mistake was made." *Campbell County School Dist. v. State*, 2008 WY 2, ¶ 10, 181 P.3d 43, 49 (Wyo.2008). It is uncontroverted that the crack was there and visible. Trooper Cheser testified that he saw it. Given this evidence, we are not convinced that the district court made a mistake.

[¶ 18] There was also conflicting evidence about whether the cracked windshield was actually one of the reasons Trooper Cheser made the traffic stop. The report prepared by the Trooper on the day Mr. Lovato was stopped made no mention of the crack in the windshield. Trooper Cheser testified that he told Mr. Lovato he was being stopped "for an obscured license plate as well as a cracked windshield," but Mr. Lovato testified that Trooper Cheser mentioned only the license plate and "never said anything about the windshield." In addition, Mr. Lovato's carbon copy of the warning ticket indicated that the warning was for a license plate violation, with the words "window violation" written in separately in ink. Trooper Cheser admitted that he initially wrote the ticket only for the license plate violation, and that he added the words "window violation" later. He did not specify how much later. Mr. Lovato testified that he received his copy of the warning ticket while he was in jail the day after he was arrested.

[¶ 19] After considering the conflicting evidence, the district court found that the cracked windshield was one of the reasons Trooper Cheser had stopped Mr. Lovato. Again, we must defer to that finding unless it is clearly erroneous. The finding is consistent with the Trooper's testimony. Mr. Lovato's evidence to the contrary is sufficiently persuasive that the district court might reasonably have found in his favor. It did not, and as the appellate court, we cannot say that the finding is clearly erroneous.

[¶ 20] Evidence about the license plate cover is also troublesome. According to Trooper Cheser, he could not read the license plate on the back of Mr. Lovato's car, but could read the one on the front "just fine." According to both Mr. Lovato and his wife, there were identical license plate covers on the front and the back of the car. In addition, Trooper Cheser described the license plate as "dark-tinted," and testified that the date sticker on the upper left corner of the license plate was "covered by the frame of the license plate protector." The actual license plate cover was accepted into evidence during the suppression hearing, and it is contained in our record on review. It is the same translucent plastic material throughout, with no frame that could have blocked Trooper Cheser's view of the date sticker. While the plastic is not entirely transparent, it is a stretch to describe it as dark-tinted.

[¶ 21] The plastic is shiny, however, and it is conceivable that in some angles of sunlight, the combination of glare and tinting could make the license plate harder to read. Trooper Cheser did not mention the angle of the sunlight or any other such details, but he did testify unequivocally that the license plate cover obscured his view of the license plate on the rear of Mr. Lovato's car. We are not in a position to assess the credibility of this testimony, or to weigh it against the conflicting evidence. The district court was in that position, and it found that:

> Trooper Cheser observed a crack in the Buick sedan's windshield. After passing the vehicle, Trooper Cheser watched the vehicle in his rearview mirror and observed a tinted cover over the license plate, preventing him from reading the license plate number in his rearview mirror, at least from that distance.

We are not definitely and firmly convinced that these factual findings were mistaken.

[¶ 22] Based on these findings of fact, the district court concluded "that Trooper Cheser possessed more than the necessary reasonable suspicion to stop [Mr.] Lovato; Trooper Cheser possessed probable cause because he personally observed [Mr.] Lovato driving the Buick sedan in violation of two statutes." Having deferred to the district court's findings of fact, we conclude that they were sufficient to provide Trooper Cheser with the reasonable suspicion necessary to stop Mr. Lovato. The initial stop was justified.

### Were the officer's actions during the detention reasonable in scope?

[¶ 23] Trooper Cheser's stated reasons for the traffic stop were the crack in the windshield and an obscured license plate. Mr. Lovato contends that Trooper Cheser's questioning of him was wholly unrelated to either of these potential traffic offenses, and therefore unreasonable in scope. He speculates that if Trooper Cheser had not extended the detention by his questions, it is plausible that Mr. Lovato would have been able to leave the scene before Trooper Green and the drug detection dog arrived.

[¶ 24] Mr. Lovato is correct that a traffic stop must be of reasonably short duration, and that there are limits to the questions that may be asked of the detained driver.

> An investigative detention must be temporary, lasting no longer than necessary to effectuate the purpose of the stop, and the scope of the detention must be carefully tailored to its underlying justification. During a routine traffic stop, a law enforcement officer may request the driver's proof of insurance, operating license, and vehicle registration, run a computer check, and issue a citation or warning. The officer may detain the driver and his vehicle only for the period of time reasonably necessary to complete these routine matters. Once the driver has produced a valid driver's license and proof that he is entitled to operate the vehicle, he must be allowed to proceed without further delay. During the stop, an officer generally may not ask the detained motorist questions unrelated to the purpose of the stop, including questions about controlled substances, unless the officer has reasonable suspicion of other illegal activities.

*Campbell v. State,* 2004 WY 106, ¶ 12, 97 P.3d 781, 784–85 (Wyo.2004) (internal citations, punctuation, and footnote omitted).

[¶ 25] According to the dispatch records kept by the Wyoming Highway Patrol, Trooper Cheser initiated the traffic stop of Mr. Lovato at 11:01:23 a.m. Trooper Green arrived at the scene at 11:05:38, and reported by radio at 11:06:09 that his drug detection dog had alerted on Mr. Lovato's car. Mr. Lovato concedes that the drug detection dog's alert gave the Troopers probable cause to detain him further, search his car, and subsequently search his person. Thus, the initial detention that Mr. Lovato challenges lasted only from the initiation of the traffic stop until the drug detection dog alerted, a total of four minutes and forty-six seconds. We agree with the district court's conclusion that the "limited amount of time that Trooper Cheser was in verbal contact with [Mr.] Lovato" does not indicate that Mr. Lovato's initial detention was unreasonably prolonged. *Compare Kunselman v. State,* 2008 WY 85, ¶ 15, 188 P.3d 567, 570 (Wyo. 2008) ("initial traffic detention lasting about ten minutes" not unreasonable); *Seymour v. State,* 2008 WY 61, ¶ 20, 185 P.3d 671, 677 (Wyo.2008) (being "detained for less than 15 minutes" not unreasonable).

[¶ 26] As to the subject matter of the questions, Trooper Cheser testified that he "asked the driver several questions regarding his trip, as far as his origin—his origin and destination." After identifying the passenger, Trooper Cheser asked Mr. Lovato "to clarify the question as far as where he was coming from and where he was headed to." Trooper Cheser then went back to his patrol car to write out the warning ticket. Mr. Lovato's testimony confirmed that Trooper Cheser asked where he was coming from and where he was going.

[¶ 27] We have previously recognized travel plans "as an acceptable area of inquiry during a traffic stop." *O'Boyle,* ¶ 48, 117 P.3d at 414. However, extensive and prolonged inquiry into the details of a detained driver's travel plans may be unreasonable. *Id.,* ¶ 58, 117 P.3d at 417. There is no rule specifically prohibiting or allowing questions about travel plans. The rule "is one of rea-sonableness under the totality of the circumstances." *Id.*

[¶ 28] There is no indication that Trooper Cheser used these questions to prolong Mr. Lovato's detention unreasonably. At least one federal court has written that "an officer may question a traffic-stop detainee *on any topic* without reasonable and articulable suspicion so long as the questioning does not prolong the stop." *United States v. Malouff,* 114 Fed.Appx. 975, 979 (10th Cir.2004) (emphasis added), quoted in *O'Boyle,* ¶ 51, 117 P.3d at 415. Mr. Lovato's detention was prolonged, and his car was searched, not because of his questioning by Trooper Cheser, but because the drug detecting dog alerted on his car. Having considered the totality of the circumstances, we cannot say that the district court erred in concluding that Trooper Cheser's questioning of Mr. Lovato was reasonable.

[¶ 29] We affirm the district court's denial of Mr. Lovato's suppression motion.