# IN THE SUPREME COURT, STATE OF WYOMING

## 2014 WY 1

**OCTOBER TERM, A.D. 2013**

*January 3, 2014*

JOY KLOMLIAM,

Appellant
(Defendant),

v.

S-13-0072

THE STATE OF WYOMING,

Appellee
(Plaintiff).

*Appeal from the District Court of Campbell County*
*The Honorable Michael N. Deegan, Judge*

*Representing Appellant:*
Nicholas H. Carter of The Nick Carter Law Firm, P.C., Gillette, WY.

*Representing Appellee:*
Gregory A. Phillips, Wyoming Attorney General; David L. Delicath, Deputy Attorney General; Jeffrey Pope, Assistant Attorney General; Darrell D. Jackson, Faculty Director, Prosecution Assistance Program; David E. Singleton, Student Director, and James Wilson, Student Intern. Argument by Mr. Wilson.

*Before KITE, C.J., and HILL, VOIGT, BURKE, and DAVIS, JJ.*

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**HILL,** Justice.

[¶1]    Joy Klomliam entered conditional pleas of guilty to one charge of possession of a controlled substance with intent to deliver and one charge of conspiracy to deliver a controlled substance, reserving the right to appeal the district court's denial of her motion to suppress.  On appeal, Klomliam contends that the marijuana evidence discovered in her vehicle following a traffic stop should have been suppressed as the product of an unlawful detention under the Wyoming Constitution.  We find that the detention was lawful and affirm.

## ISSUES

[¶2]    Klomliam states the issue for our review as follows:

> Did the District Court err in denying [Klomliam's] Motion to Suppress when the detention of [Klomliam] exceeded the scope of permissible detention under article 1, § 4 of the Wyoming Constitution?

## FACTS

[¶3]    On November 6, 2011, Corporal Randy Parker of the Campbell County Sheriff's Department was parked in the crossover near mile marker 120 on Interstate 90, west of Gillette, Wyoming, monitoring east and westbound traffic.  Shortly after midnight, Corporal Parker clocked a red Dodge Magnum traveling eastbound at 83-84 miles per hour.  As the vehicle approached Corporal Parker's location, it slowed down to 73 miles per hour.

[¶4]    Corporal Parker pulled the vehicle over at mile marker 122.  He approached the vehicle from the passenger side, using the spotlight on his patrol car and a flashlight to illuminate the vehicle.  Once Corporal Parker reached the passenger side, he observed an adult female driver, an adult male in the front passenger seat, and what turned out to be three young children in the back seat.  In the back end of the vehicle, Corporal Parker observed that the vehicle was full of luggage to above the back seat, and in the front of the vehicle, he observed "a lot of travel food, wrappers, stuff loose like it had been lived in for a few days" and "a single key in the vehicle with one other automobile key on the ignition."

[¶5]    Corporal Parker knocked on the passenger window, advised the driver, Klomliam, that he had stopped her for speeding, and he asked for her driver's license, vehicle registration, proof of insurance, who owned the vehicle, and if there were any weapons in the vehicle.  While Klomliam was searching for the requested documents, Corporal Parker asked Klomliam and her adult passenger where they were traveling from.

1

Klomliam and the adult passenger both responded, with Klomliam stating they were traveling from Washington and the passenger stating they were traveling from Indiana. They then clarified that they had left Indiana on November 3rd, traveled to Washington, and were then on their return trip to Indiana. Corporal Parker asked additional questions about Klomliam's travel plans, including what she was doing in Washington and whether they were planning to drive through the entire night. Approximately two and a half minutes into the stop, Klomliam handed Corporal Parker her driver's license and a bill of sale for the vehicle she was driving, but she was unable initially to locate the vehicle registration and proof of insurance.

[¶6]    While Klomliam continued to search for her vehicle registration and proof of insurance, Corporal Parker asked additional questions about their travel, including how far they intended to travel that evening, when they had left Indiana to travel to Washington, and why their trip involved such a quick turnaround. In response to these questions, Klomliam stated that they left Indiana on Thursday, November 3rd, drove to Washington to visit family, and left Washington that morning, November 6th, to return to Indiana. After a little under three minutes from his initial contact with Klomliam, Corporal Parker told Klomliam to continue looking for her vehicle registration and proof of insurance and returned to his patrol car with Klomliam's driver's license and the vehicle's bill of sale.

[¶7]    After Corporal Parker returned to his patrol car, he contacted dispatch concerning the vehicle plates and began writing out a warning ticket. Corporal Parker spent the next approximately nine minutes in his patrol car before returning to speak to Klomliam. He described his activities during that period of time as follows:

> I am writing out the citation, or the warning. I am checking for travel distance and looking at the documents that she gave me, and for some of them I can read without reading glasses, some I have to have reading glasses. And reading through, saw that the vehicle, which I would estimate is worth $10,000 or more, is a fairly new Dodge Magna (sic), had a Bill of Sale for $3,000. I thought that was pretty strange. The vehicle looked in good shape other than the travel, lived-in type look.
> So then I did a driver's license check and found out, on the driver's license and registration, that the car had just been registered on the 2nd and they left on the 3rd.

[¶8]    At approximately twelve and a half minutes into the stop, Corporal Parker called out to Klomliam and asked her to step back to his patrol car. About forty-five seconds later, Klomliam complied with that request and brought with her the proof of insurance that Corporal Parker had requested. Corporal Parker asked Klomliam additional

2

questions about her travel plans and about the vehicle and her insurance, including when she bought the vehicle, as the bill of sale was undated, why the vehicle only cost $3,000.00, when she insured the vehicle, and why she had delayed insuring the vehicle until November 1st. Klomliam explained that she had purchased the vehicle about a month earlier, that the vehicle was a rebuild, and that she delayed insuring it because she did not immediately plate the vehicle. In response to Corporal Parker's additional questions concerning her travel plans, Klomliam stated that she was traveling to Seattle to visit family visiting from Thailand. Corporal Parker then asked Klomliam her nationality.

[¶9]    During this same period of questioning, Corporal Parker asked Klomliam and her adult passenger about their relationship to each other and the children in the vehicle. Corporal Parker described those conversations as follows:

> Q.    And after you visit with her again about the travel plans, did she give you inconsistent or different information?
> A.    Well, I asked her who all was in the car. She told me she was traveling to visit a relative coming in from Thailand, that she was a resident alien, that she was from Thailand. That didn't make sense. It was kind of, you are only, you are traveling to see somebody you haven't seen before from Thailand, and you travel 36 hours, and you are there less than a day, and you are on the road again. It didn't make sense to me. So I asked her who was in the car. She stated the male half in the car, Mr. Elliott, was her boyfriend, and that the kids were hers, except for one of them, which was her boyfriend's wife's kid. And I was a little confused on that, so I went up and asked her to stay by the car, and went up and talked to Mr. Elliott.
> Q.    Did you speak with him about the relationship that he may or may not have had with the defendant?
> A.    I did.
> Q.    Can you describe that conversation for us?
> A.    I asked him how he was related to the driver. And he told me that the driver was his sister-in-law. I asked how long he had known the driver. I had already asked the defendant how long she had known him, and she told me two years.
> I asked him how long. He hymn-hawed (sic) and then asked one of the kids in the back, the oldest, I believe how old he was, when he told him he was 9, he told me he knew her 9 or 10 years which is a big contradiction between the two.

3

> Q. Did you have any further discussions with Mr. Elliott at that time?
>
> A. Not at that time.
>
> Q. Okay. Then what happened?
>
> A. I went back and talked to the defendant about the contradiction. She said that she had known him for 3 to 5, or 3 years, I believe is what she changed it to, and that he was her boyfriend's brother-in-law or brother. So she could overhear my part of the conversation I am sure, and I believe it changed what she had told me from the boyfriend to the boyfriend's brother.

[¶10] Corporal Parker's questioning of Klomliam after calling her back to his patrol car lasted approximately three minutes. His questioning of Klomliam's adult passenger lasted approximately one minute, after which his follow-up questions of Klomliam, concerning the inconsistencies, lasted about forty-five seconds. After asking his follow-up questions of her, Corporal Parker instructed Klomliam to return to her vehicle and wait in the vehicle. Corporal Parker then, about nineteen minutes into the stop, called dispatch and requested a cover car to provide assistance so that he could check the vehicle identification number on the vehicle's dash and door. He explained:

> Q. Now you indicated that you were going to wait for a cover car?
>
> A. Yes, sir.
>
> Q. Why do you do that?
>
> A. Well, by that time I had inconsistent stories, a story and indicators of criminal activity. I believe that it was probably drug-related or maybe a stolen car, I didn't know which. I can't see in the car very. Well, (sic) there are two of them, one of me. I am going to have somebody else there when I check the VIN.

[¶11] Less than five minutes after Corporal Parker requested a cover unit, and twenty-three minutes into the stop, the cover car arrived, driven by Deputy Sharp of the Campbell County Sheriff's Office. Corporal Parker discussed the situation with Deputy Sharp for about one minute and indicated he was going to run his drug dog around the vehicle. At approximately twenty-four minutes into the stop, Corporal Parker again asked Klomliam to step out of her vehicle and informed her that he was going to run his drug dog around her vehicle. Corporal Parker explained his intentions:

> Q. Okay. So after the defendant goes over to stand with Deputy Sharp, what do you do?

4

A. I go ahead and get canine Magnum out and I do a quick pass around to see if there is a drug odor coming from the car. If there isn't, I am going to check the VIN, and go on from there.

[¶12] Corporal Parker ran the dog around the vehicle, and the dog alerted and indicated to the presence of a controlled substance. After the arrival of another cover unit and the removal of the children and adult passenger from the vehicle, Corporal Parker searched the vehicle and found two hockey bags and one backpack type bag containing dryer sheets and marijuana. In total, thirty-seven to forty pounds of marijuana was seized from the vehicle.

[¶13] Klomliam was arrested and charged with possession of a controlled substance with intent to deliver, in violation of Wyo. Stat. Ann. § 35-7-1031(a)(ii) and conspiracy to deliver a controlled substance, in violation of Wyo. Stat. Ann. § 35-7-1031(a)(ii) and § 35-7-1042. Klomliam filed three suppression motions: 1) a motion to suppress based on an alleged illegal detention of Klomliam and search of her vehicle; 2) a motion to suppress based on an alleged lack of probable cause to arrest Klomliam; and 3) a motion to suppress challenging the reliability of the drug dog. Before the district court heard the motions, Klomliam withdrew the motion to suppress challenging the reliability of the drug dog. Following a review of the disc recording of the stop and an evidentiary hearing, the court denied Klomliam's suppression motions. The court concluded that Corporal Parker's initial questioning was permissible to put the traffic violation in context and that "Corporal Parker had the requisite reasonable suspicion from the criminal indicators to inquire further into [Klomliam's] travel plans and relationship status."

[¶14] After the court's denial of her suppression motions, Klomliam changed her plea and entered conditional pleas of guilty to both charges. As part of Klomliam's plea agreement, she reserved the right to appeal the denial of her suppression motions. Klomliam was sentenced to consecutive sentences of three to five years in prison on each count, with the sentences suspended in favor of ten years of supervised probation. Klomliam thereafter filed her appeal with this Court.

**STANDARD OF REVIEW**

[¶15] This Court reviews a district court ruling on a motion to suppress as follows:

We review the district court's factual findings on a motion to suppress for clear error. We defer to those findings and view the evidence in the light most favorable to the prevailing party because the district court is in the best position to weigh the evidence, assess the credibility of

witnesses, and make the necessary inferences, deductions, and conclusions. However, "we review the ultimate determination regarding the constitutionality of a particular search or seizure *de novo*." *Sen*, ¶ 25, 301 P.3d at 117 (citing *Owens*, ¶ 8, 269 P.3d at 1095). *See also Lovato v. State*, 2010 WY 38, ¶ 11, 228 P.3d 55, 57–58 (Wyo. 2010) (quoting *Yoeuth v. State*, 2009 WY 61, ¶ 16, 206 P.3d 1278, 1282 (Wyo. 2009)); *Meadows v. State*, 2003 WY 37, ¶ 23, 65 P.3d 33, 40 (Wyo. 2003) (quoting *Gehnert v. State*, 956 P.2d 359, 362 (Wyo. 1998)).

*Hunnicutt-Carter v. State*, 2013 WY 103, ¶ 20, 308 P.3d 847, 852 (Wyo. 2013); *see also Phelps v. State*, 2012 WY 87, ¶ 19, 278 P.3d 1148, 1153 (Wyo. 2012).

## DISCUSSION

[¶16] Klomliam does not challenge the initial stop for her traffic violation. She challenges only the initial detention, which she contends was unreasonable because Corporal Parker's questioning was not tailored to the traffic stop and was not supported by a reasonable suspicion that a crime was being committed. We disagree and conclude that the district court decision denying Klomliam's motions to suppress was supported by the record and in accordance with law.

[¶17] On appeal, Klomliam presents only a state constitutional challenge and does not assert a separate Fourth Amendment challenge under the United States Constitution. Accordingly, we limit our analysis to art. 1, § 4 of the Wyoming Constitution, which requires that searches and seizures "'be reasonable under all of the circumstances.'" *Phelps*, ¶ 16, 278 P.3d 1153 (quoting *Vasquez v. State*, 990 P.2d 476, 485-86 (Wyo. 1999)). In making this reasonableness determination in the context of a traffic stop and detention, we are guided by certain settled parameters.

During a routine traffic stop, a law enforcement officer may request a driver's license, proof of insurance and vehicle registration, run a computer check, and issue a citation. *Campbell*, ¶ 12, 97 P.3d at 785; *Damato*, ¶ 13, 64 P.3d at 706 (citing *Burgos–Seberos v. State*, 969 P.2d 1131, 1133 (Wyo. 1998); *United States v. Elliott*, 107 F.3d 810, 813 (10th Cir. 1997)). Generally, the driver must be allowed to proceed on his way without further delay once the officer determines the driver has a valid driver's license and is entitled to operate the vehicle. *Damato*, ¶ 13, 64 P.3d at 706; *see also United States v. Wood*, 106 F.3d 942, 945 (10th Cir.1997); *Barch*, ¶ 9, 92 P.3d at 832. In the absence of consent, an officer may expand

the investigative detention beyond the purpose of the initial stop only if there exists an "'objectively reasonable and articulable suspicion' that criminal activity has occurred or is occurring." *Damato*, ¶ 13, 64 P.3d at 706 (quoting *United States v. Williams*, 271 F.3d 1262, 1267 (10th Cir.2001)). The existence of objectively reasonable suspicion of criminal activity is determined by evaluating the totality of the circumstances. *Damato*, ¶ 16, 64 P.3d at 707. The "whole picture" must be considered, "[c]ommon sense and ordinary human experience are to be employed, and deference is to be accorded a law enforcement officer's ability to distinguish between innocent and suspicious actions." *Id.* (citing *Wood*, 106 F.3d at 946).

*Garvin v. State*, 2007 WY 190, ¶ 14, 172 P.3d 725, 729 (Wyo. 2007).[1]

[¶18]   With these principles in mind, we turn to the district court's findings in support of its order denying Klomliam's motions to suppress. The court found Corporal Parker to be a credible witness and then made detailed findings concerning the initial detention, including the following:

> 16.     Although the disc recording is very poor during certain key periods, the court finds Corporal Parker asked roughly 65 questions throughout the entire detention. [FN2: The court includes in this total the innocuous questions such as "How are you tonight?" and "Joy, would you step back here?" When counting only questions of substance, the court finds Corporal Parker asked [Klomliam] a total of 52 questions.] At least six of those questions were asked of the male passenger.  The detention lasted approximately 25 to 27 minutes before canine Magnum sniffed the vehicle and indicated to the presence of drugs at the driver's side window.
>
> 17.     The court finds, having considered all of the circumstances, the detention of [Klomliam] was reasonable.

---

[1]  This Court's analysis in Garvin was a Fourth Amendment analysis.  We have observed, however, that in assessing the reasonableness of a traffic stop and detention, there is not a significant difference between our federal and state analysis, given that under either analysis we are considering the reasonableness of the government intrusion in light of all the circumstances. *Fertig v. State*, 2006 WY 148, ¶¶ 18-19, 146 P.3d 492, 497-98 (Wyo. 2006); *see also Yoeuth v. State*, 2009 WY 61, ¶ 24, 206 P.3d 1278, 1284 (Wyo. 2009); *O'Boyle v. State*, 2005 WY 83, ¶ 50, 117 P.3d 401, 415 (Wyo. 2005).  We therefore employ these same considerations under a state constitutional analysis.

18. A number of Corporal Parker's questions were clearly permissible, such as his request for [Klomliam's] license, registration and insurance as well as his questions seeking to clear up when the vehicle was purchased, insured and plated (as the Bill of Sale provided by [Klomliam] lacked a month and day).

19. Corporal Parker's initial questions concerning [Klomliam's] travel plans were also permissible.

20. While "purposeful probing by law enforcement, amounting to a fishing expedition in the hope that something might turn up, is not permitted . . ." *O'Boyle*, ¶ 48, 117 P.3d at 414, a law enforcement officer may make an "inquiry into travel plans during a traffic stop at least to the extent reasonably necessary to put the traffic violation in context." *Id*.

21. Corporal Parker's questions about where [Klomliam] and her passengers were coming from, where they were headed to and how long they had been on the road helped the Corporal put the traffic violation (speeding) in context.

22. The court finds there were some questions which were most likely outside the scope of the traffic stop, including those about [Klomliam's] citizenship and nationality. While the continued and repeated inquiry with respect to travel plans and the questions concerning the relationships among the vehicle's occupants may have prolonged the traffic stop to some extent, the court finds Corporal Parker had the requisite reasonable suspicion from the criminal indicators to inquire further into [Klomliam's] travel plans and relationship status.

23. In evaluating the totality of the circumstances, the court finds Corporal Parker (based upon his training and experience) had developed, early in the traffic stop, reasonable suspicion [Klomliam] was transporting drugs. In reaching its decision, the court finds the following significant: the nature and condition of the vehicle, the direction of travel, the contradictory statements simultaneously volunteered by [Klomliam] and her male passenger when asked where they were coming from, the nervous behavior of the male passenger as well as the Bill of Sale (produced by [Klomliam]

initially in lieu of insurance and registration) which showed [Klomliam] had purchased a car valued at $10,000.00 for $3,000.00 and had plated and insured it shortly before embarking on a long-distance but short-duration trip from Gary, Indiana to Seattle, Washington.

[¶19] The court separately identified the evidence from which it drew the factors significant to the court's conclusion that Corporal Parker, early in the stop, had a reasonable suspicion that Klomliam was engaged in criminal activity. The following evidence was drawn from Corporal Parker's testimony:

--with respect to the nature and condition of the vehicle, the vehicle had a "lived-in" look, with food wrappers and other garbage scattered about, and that the key in the ignition was on a key ring with only one other key;

--with respect to the vehicle's bill of sale, the document showed that the vehicle had been purchased for $3,000.00, a price that was much lower than Corporal Parker's estimate of the vehicle's value of $10,000.00;

--with respect to the plating and insuring of the vehicle, both were done the day before Klomliam departed Indiana to travel to Washington; and

--with respect to the long-distance but short-duration nature of the trip, Klomliam told Corporal Parker she left Gary, Indiana on Thursday, November 3rd, drove to Seattle, Washington to visit family, and began her return trip to Indiana the morning of November 6th.

[¶20] The court found that each piece of this evidence was described by Corporal Parker as being, based on his experience and training, an indicator of possible criminal activity. These findings are supported by Corporal Parker's testimony. With respect to the significance of the vehicle's condition, Corporal Parker testified:

> Q.     Now you have identified a couple of things that you thought were significant in the vehicle, the wrappers that were on the floor, this issue with the keys, why are those things significant to you?
> A.     Those, through training that I have received, and on a repeated basis, are indicators of possible criminal activity. Most people when they travel, they take their garbage out unless they are traveling and just not stopping.
>     The key is important because most people have, if you look at your own key ring, you have multiple keys on

9

your key [ring]. Usually with criminal behavior that is an indicator. That doesn't mean that it is. It is just an indicator.

[¶21] With respect to the significance of the bill of sale and date of registering and insuring the vehicle, Corporal Parker testified:

> And reading through, [I] saw that the vehicle, which I would estimate is worth $10,000 or more, is a fairly new Dodge Magna (sic), had a Bill of Sale for $3,000. I thought that was pretty strange. The vehicle looked in good shape other than the travel, lived-in type look.
> So then I did a driver's license check and found out, on the driver's license and registration, that the car had just been registered on the 2nd and they left on the 3rd. That again would be an indicator that is consistent with drug trafficking and/or criminal behavior.

[¶22] With respect to the significance of Klomliam's long-distance but short-duration trip, Corporal Parker testified:

> A. They both ended up stating they were coming from Washington, and that they had left earlier that morning. They also advised me they had left from Indiana on the 3rd and this was the 6th. And that was a pretty quick turn around trip, a very short time period.
> Q. Did you find that to be significant?
> A. I did.
> Q. And why is that?
> A. Again, it is an indicator, not – it is an indicator that there might be criminal behavior. A lot of either drug trafficking or other things of that nature have a very short turn around time. They travel from one place to another, travel back and, you know it is a 34, 36-hour travel time from Gary, Indiana to Seattle, Washington. And coming back in such a short time with very little time for any personal business in the state.

[¶23] We agree with the district court that under the totality of the circumstances, Corporal Parker had, early in the stop, a reasonable suspicion of criminal activity that justified the extended detention and expanded scope of questioning. As noted earlier in this opinion, a law enforcement officer may, during a routine traffic stop, request vehicle registration and proof of insurance, and run a computer check. *Garvin*, ¶ 14, 172 P.3d at 729; *see also Frazier v. State*, 2010 WY 107, ¶ 11, 236 P.3d 295, 299 (Wyo. 2010);

*Campbell v. State*, 2004 WY 106, ¶ 12, 97 P.3d 781, 784-85 (Wyo. 2004). This Court has also held that travel plans are an "acceptable area of limited inquiry during a routine traffic stop." *Frazier*, ¶ 12, 236 P.3d at 299. We have said:

> We have previously recognized travel plans "as an acceptable area of inquiry during a traffic stop." *O'Boyle*, ¶ 48, 117 P.3d at 414. However, extensive and prolonged inquiry into the details of a detained driver's travel plans may be unreasonable. *Id.*, ¶ 58, 117 P.3d at 417. There is no rule specifically prohibiting or allowing questions about travel plans. The rule "is one of reasonableness under the totality of the circumstances." *Id.*

*Lovato v. State*, 2010 WY 38, ¶ 27, 228 P.3d 55, 61 (Wyo. 2010).

[¶24] In *Frazier*, we found a trooper's questions regarding the defendant's travel plans reasonable under the following circumstances:

> When the trooper initially approached the vehicle, he informed Mr. Frazier of the reason for the stop and briefly asked about his travel plans. Once Mr. Frazier was in the patrol car, the trooper asked him where he had been on his road trip, how long he had been in Reno, and how long he had lived in Tennessee. Mr. Frazier answered these questions and volunteered information about his sick grandfather. The trooper followed up with two questions about the seriousness of the grandfather's condition. Although these questions may not have been directly related to the obstructed license plate, the scope of the inquiry was not unreasonable under the circumstances.

*Frazier*, ¶ 12, 236 P.3d at 299.

[¶25] Corporal Parker's initial contact with Klomliam, from the time he knocked on the passenger window to when he returned to his patrol car with Klomliam's driver's license and the vehicle bill of sale, lasted a little under three minutes. During that time, Corporal Parker asked around six or seven questions concerning Klomliam's travel plans, including where they were coming from, why they were in Washington, when did they leave Washington, were they driving straight through the night, how far they planned to travel that evening, when they left Indiana to go to Washington, and why such a quick turn around and short trip. Under the circumstances, as in *Frazier*, we do not find the scope of questioning unreasonable. The questions at this point were few in number, and given that Klomliam and her adult passenger gave inconsistent answers when initially

asked where they were traveling from, we would expect that a law enforcement officer would follow up on the inconsistency.

[¶26] Nor can we conclude that the questions unreasonably prolonged the stop. Corporal Parker's follow-up questions about Klomliam's travel plans were asked while Klomliam was searching for her vehicle registration and proof of insurance. Indeed, Corporal Parker stopped asking questions while Klomliam was still searching for the document, and he returned to his patrol car, instructing Klomliam to remain in her vehicle and continue searching for the requested documents.

[¶27] After Corporal Parker returned to his patrol car, he spent the next nine minutes running computer checks on Klomliam's driver's license and her vehicle, reviewing the vehicle's bill of sale, and writing out a warning. While he was completing these activities, he simultaneously used his cell phone to enter a Google search for the distance between Gary, Indiana and Seattle, Washington. These nine minutes were spent on tasks permitted during a routine traffic stop and did not impermissibly extend Klomliam's detention. Additionally, Corporal Parker testified on cross-examination that his search for the distance between Indiana and Washington was relevant to the speeding violation:

> Q. How would the distance between Indiana and Washington be relevant to Ms. Klomliam speeding?
> A. In reference to her speeding?
> Q. Right.
> A. Most people have a destination, if they are running late, trying to make up time, I let them know a 5 or 7 miles is not going to make more than 30 minutes or an hour of your travel distance.

[¶28] Corporal Parker completed the above-described tasks approximately twelve to thirteen minutes into the stop, and at this point, he had a reasonable suspicion that Klomliam was engaged in criminal activity. Corporal Parker testified that the observations he made during this period, including the vehicle's condition, the bill of sale, the registration of the vehicle just before leaving on a trip, and the long-distance, short-duration nature of the trip were all indicators of possible criminal activity. We conclude that at this point, Corporal Parker had not impermissibly extended the detention and that he had reasonable suspicion to support additional questioning of Klomliam and her adult passenger beyond the scope of the traffic stop.[2]

---

[2] The district court cited the direction of travel and the nervous behavior of the male passenger as additional observations that would have contributed to the totality of the circumstances that gave Corporal Parker reasonable suspicion of criminal activity. While each of these factors may in certain cases contribute to a reasonable suspicion during a stop, we did not find in our review of Corporal Parker's testimony that Corporal Parker cited these as factors contributing to his suspicion. We therefore do not give weight to either factor. Even without these

12

[¶29]   At this point, approximately thirteen minutes into the stop, Corporal Parker called Klomliam back to his patrol car, obtained her proof of insurance and asked additional questions about the vehicle, Klomliam's travel plans, her relationship to her male passenger and the children in the vehicle, and her insurance.  Over the next four to five minutes, Corporal Parker received further confusing and contradictory statements from Klomliam and her male passenger, and at a little over eighteen minutes into the stop, Corporal Parker called for a cover car.  The cover car arrived in less than five minutes, and approximately two minutes later, Corporal Parker ran the drug dog around the vehicle and the dog alerted to the presence of a controlled substance.

[¶30]   At twelve to thirteen minutes into the stop, Corporal Parker had reasonable suspicion sufficient to expand the scope of his questioning and detention, and at approximately twenty-five minutes into the stop, the drug dog alerted to the presence of a controlled substance in the vehicle.   We conclude that under the totality of the circumstances, Corporal Parker's actions were reasonable and did not violate art. 1, § 4 of the Wyoming Constitution.

[¶31]   In arguing to the contrary, Klomliam cites *O'Boyle v. State*, 2005 WY 83, 117 P.3d 401 (2005), in which this Court held that a trooper impermissibly questioned the defendant beyond the scope of the traffic stop.  Klomliam's reliance on *O'Boyle* is misplaced.  While the case did address a trooper's questions that deviated from the scope of the traffic stop, the State conceded in that case that the trooper had no reasonable suspicion of criminal activity to support further questioning and investigative detention. *Id.*, ¶ 32, 117 P.3d at 410-411.

[¶32]   The circumstances of the present case are more akin to those presented in cases where we have addressed a totality of circumstances that provided a reasonable suspicion of criminal activity to support further questioning.  *See, e.g., Phelps*, ¶ 27, 278 P.3d at 1155 (circumstances including direction of travel, rental car, behavior of vehicle occupants, unusual travel plans); *Negrette v. State*, 2007 WY 88, ¶ 15, 158 P.3d 679, 683 (Wyo. 2007) (circumstances including inconsistencies in license plate and registration, long-distance trip of short-duration, inconsistencies between defendant's statements concerning vehicle ownership and insurance documents, defendant's nervousness).  In considering the whole of the circumstances, a law enforcement officer's ability to distinguish between innocent and suspicious actions is to be accorded deference, and courts should assess the facts articulated by an officer "through the lens of a reasonable law enforcement officer." *United States v. Lopez-Martinez*, 25 F.3d 1481, 1484 (10th Cir. 1994); *see also Garvin*, ¶ 14, 172 P.3d at 729.  Corporal Parker in this case identified several factors early in the stop that, based on his training and experience, gave him a

---

factors, though, we find that the totality of the circumstances supported Corporal Parker's reasonable suspicion of criminal activity.

reasonable suspicion that Klomliam was engaged in criminal activity. Those reasonable suspicions supported Corporal Parker's expanded scope of questioning, and we thus uphold the district court's denial of Klomliam's suppression motions.

## CONCLUSION

[¶33] Under the totality of the circumstances, Corporal Parker's questioning and detention of Klomliam were reasonable and did not violate art. 1, § 4 of the Wyoming Constitution. Affirmed.